[L. A. No. 21160. In Bank. Oct. 11, 1951.]

FELIX J. WEIL, Respondent, v. HELEN K. WEIL, Appellant.

Norman Newmark, George I. Devor and Francis C. Whelan for Appellant.

Pacht, Warne, Ross & Bernhard, Isaac Pacht, Clore Warne, Rudolph Pacht, Shirley Adelson Siegel and Maxwell E. Greenberg for Respondent.

TRAYNOR, J.—Plaintiff, Felix J. Weil, brought this action for divorce against defendant, Helen K. Weil, alleging extreme cruelty. Defendant answered, denying cruelty, and cross-complained for separate maintenance, alleging desertion and 43 specific acts of cruelty. By stipulation the allegations of the cross-complaint were deemed denied. At the conclusion of the trial defendant amended her cross-complaint to pray for a divorce. It was agreed that all findings might be waived, except the finding that plaintiff was guilty of one of the specific charges of cruelty. A divorce was granted to defendant, she was awarded 30 months alimony at $300 a month, certain contested furs and jewels were decreed to be her separate property, and plaintiff was ordered to pay specified sums to her attorneys. The family home was adjudged to be the separate property of plaintiff. Defendant and her then attorney consented to the judgment and agreed to accept it as "final."

Shortly after the decree was entered, defendant announced her refusal to comply with its provisions. She discharged her attorney, moved for a new trial, and then engaged her present counsel. The motion for new trial was denied. Requests for orders requiring plaintiff to pay fees for defendant's counsel and costs in connection with the new trial motion and for similar fees and costs on appeal were also denied. Defendant has appealed from the judgment and from the orders denying fees and costs. Plaintiff has not appealed.

Defendant's principal contention is that the trial judge was guilty of misconduct in coercing her into amending her prayer and consenting to the judgment. In support of this contention she has filed an affidavit describing the circumstances under which the alleged coercion took place and has also presented an affidavit of her trial attorney, Francis C. Whelan. Counteraffidavits have been filed by plaintiff and by his attorneys, Isaac Pacht and Rudolph Pacht. Certain statements made by the trial judge on the last day of the trial and during the argument on defendant's request for counsel fees in connection with the motion for new trial are also pertinent.

The question presented is one of fact. In deciding this question, we have carefully examined not only the foregoing affidavits but also the entire trial transcript and the numerous exhibits. The judicial conduct claimed to be improper consisted of comments by the judge to counsel at the bench and in chambers; of necessity, therefore, we have relied principally upon the affidavits of the attorneys who were present on those occasions. We have given less weight to the self-serving statements of defendant's affidavit, not only because she proved at the trial to be an unreliable witness, but also because her version of the judge's remarks is hearsay and goes beyond that of her trial attorney, from whom she obtained her information.

The trial lasted 15 days. The transcript discloses that on the twelfth day of testimony the trial judge interrupted cross-examination of defendant to call counsel to the bench. The affidavit of Francis C. Whelan, defendant's attorney, recites that the judge "stated in substance, among other things, that he felt it was needless to prolong the trial and that in the event defendant and cross-complainant amended her cross-complaint to ask for a divorce he, the said Judge, was disposed to grant her a divorce and alimony for a short period, but that he, the said trial Judge, didn't believe in separate maintenance

for short marriages and that unless there was additional evidence that he hadn't heard he didn't consider that separate maintenance should be granted in this case. . . ." Plaintiff's attorney's version of this conference (the Isaac Pacht affidavit) is that the judge "stated that in view of the admissions and contradictions already elicited under cross-examination, he could see no useful purpose being served in my continuing the cross-examination with other material which might prove embarrassing to Helen K. Weil. . . . In the course of the discussion at the bench, which was of very short duration, the Judge stated that on the evidence which he had heard thus far, it did not appear to him that this was a case for separate maintenance, although his mind had not been made up and would be kept open until all the evidence had been introduced and the case submitted to him for decision. . . . Mr. Whelan and I suggested that a recess be taken until the following day to give counsel an opportunity to discuss a possible settlement of the case. Judge Baird agreed to this."

The statement in the Whelan affidavit that the judge remarked that it was "needless to prolong the trial" is not inconsistent with Pacht's statement that the judge said he could see "no useful purpose" in continuing the cross-examination "in view of the admissions and contradictions already elicited." Moreover, the record supports Pacht's more specific explanation of the judge's action. Defendant had been examined about a day and a half when counsel were called to the bench. In several material matters she had been forced to concede misstatements in her earlier testimony.* One of her charges of cruelty against plaintiff was that he had offended and shocked her by discussing indiscreet conduct of certain persons of his acquaintance, that he had persisted in associating with such persons in spite of her disapproval, and that he had accused her of being "prudish." On cross-examination, therefore, defendant was called upon to explain her own relationship with plaintiff before their marriage and while plaintiff was still married to a former wife. The judge's interruption

---

*For example, defendant testified that while the parties were living in New York, early in their marriage, she had been forced to protest against intrusions into their home by plaintiff's friends and relatives, and that on one such occasion, during a "typical week," she had complained to him that "Ursula [plaintiff's stepdaughter] has used the house for her friends for jitterbug parties twice this week, and these are all little things but they are difficult for me. . . ." On cross-examination defendant admitted that at all times covered by this testimony Ursula had been in Colorado and had held no dances in their New York home.

of the cross-examination immediately followed the introduction into evidence of a communication from a third party indicating that on a trip to Mexico before their marriage plaintiff and defendant had posed as man and wife. Defendant admitted intimate relations with plaintiff for over a year preceding plaintiff's divorce from his former wife, and certain letters written by defendant describing this relationship were introduced. The judge himself later stated that it was to avoid further embarrassment, particularly to defendant, that he urged a cessation of such evidence and a settlement of the case.

The judge's statement that he did not believe in separate maintenance for short marriages does not, in our opinion, evidence an unwillingness to try defendant's case according to law. A judge is not required to approve every statute or precedent by which his decision is governed. Like other citizens he is bound, not to believe in a particular law, but to obey it. Thus, he may doubt the wisdom of particular economic legislation, but it is nevertheless his duty to enforce it in a proper case. A judge who disagrees with the policy of a statute is not necessarily disqualified from hearing a case in which that statute must be applied. In the present case, there has been no showing that the judge's opposition to separate maintenance for short marriages was anything more than a personal opinion concerning the wisdom of the legislation involved. According to the Pacht affidavit, the judge stated that on this issue "his mind had not been made up and would be kept open." Whelan's affidavit also shows that the judge's observation was qualified, for it quotes him as saying that he did not believe separate maintenance should be granted in this case "unless there was additional evidence that he hadn't heard." Had he regarded length of marriage as a controlling circumstance, "additional evidence" would have made no difference to him.

The judge was guilty of no misconduct in thus expressing to the parties what he believed the law should be. The Legislature itself has not infrequently heeded judicial comment suggesting modification of statutes. A judge may properly indicate to litigants the hardship that may result from a rigid insistence upon technical rights. Such suggestions are peculiarly appropriate in a court of equity, and all the more so when the task before the court involves the difficult social and legal adjustments that attend the tragedy of an unsuccessful marriage. Defendant had divorced her

first husband before she met plaintiff, and she knew that plaintiff also had been divorced. Even after this suit was begun, settlement negotiations were had between the parties predicated upon the assumption that a divorce would be granted. It is apparent, therefore, that defendant's prayer for separate maintenance was not based upon conscientious or religious objections to divorce. In view of this fact, and in view of the seriousness and finality of the marital rupture, as disclosed by the evidence, it was not error for the judge to urge divorce as the more appropriate solution to their problems. ■ "[P]ublic policy does not discourage divorce where the relations between husband and wife are such that the legitimate objects of matrimony have been utterly destroyed." (*Hill* v. *Hill*, 23 Cal.2d 82, 93 [142 P.2d 417].)

It is clear from the record that the trial judge was anxious to spare the parties the spectacle of further embarrassing testimony; that he was tentatively persuaded that defendant's charges were exaggerated and her testimony unreliable and that plaintiff should be given a divorce; that, owing to defendant's possible need of an early operation, together with plaintiff's relatively favorable financial position and the absence of community property, he felt the desirability of temporary payments by plaintiff to enable defendant to reestablish herself economically; that in view of the merits of the respective cases as thus far presented, and particularly since this marriage had lasted less than five years, he was unwilling to decree separate maintenance as a means of effecting defendant's economic adjustment, for that would have deprived plaintiff of a divorce; and that he was willing to grant a divorce nominally to defendant in order that temporary alimony might be provided. There is no indication in either affidavit that he had prejudged the facts of the case—these were tentative views and expressly subject to modification in the event that later evidence should require it.

At that time defendant declined to amend her prayer, and the trial proceeded. At the close of the fourteenth day, after all evidence had been presented, another conference was held. The Whelan affidavit states that the judge told counsel, in chambers, "that there was enough evidence to justify him in granting a divorce to either party to this action but that in the event defendant and cross-complainant amended her cross-complaint to pray for a divorce he would grant her a divorce and would make an order providing for payment of alimony to defendant and cross-complainant for a period of 30 months

at the rate of $300 per month, plus a maximum expense of $1,000 for an operation if had by her, and that in the event defendant and cross-complainant did not so amend he would not grant her separate maintenance but would grant a divorce to plaintiff and cross-defendant, in which event defendant and cross-complainant could not be given any alimony whatsoever." The affidavit further states that on the following day Whelan and his client "had a conference outside of the court room at which time affiant told said Helen K. Weil that the trial Judge had stated that unless she amended her cross-complaint to pray for a divorce and consented to accept the judgment of the trial Judge as final he was going to grant a divorce to plaintiff and cross-defendant upon the complaint of plaintiff and cross-defendant; that thereupon affiant advised the said Helen K. Weil that if she wished to get judgment for anything in addition to her furs and jewels she would have to amend her cross-complaint to pray for a divorce and state in open court that she accepted the judgment of the trial Judge as final; that thereupon the said Helen K. Weil stated that if there was no alternative and that if, in order to get judgment for anything in addition to her said furs and jewels, she would have to so amend and so consent, she would do so, and thereupon the said Helen K. Weil authorized affiant to amend her cross-complaint accordingly. . . ."

The Pacht affidavit states that at this later conference "Judge Baird said that if we so desired he was now prepared to tell us what conclusions he had come to in the case. Mr. Whelan and I invited him to give us his views; thereupon the Judge stated that it was clear to him from the evidence that he had heard and the reaction which he had received from the testimony of all the witnesses and his observation of them, that Helen K. Weil, soon after the marriage of the parties, had embarked upon a campaign to obtain for herself an interest in the trust funds to which Felix J. Weil had invasion rights; that her continued pressure and intrigue upon Felix J. Weil to accomplish this purpose was the basic cause for the differences between them, and that the evidence introduced in behalf of Felix J. Weil was more than ample to justify a decree in his favor. However, the Judge said he hesitated to give a judgment of divorce to the husband because this would debar him from awarding Helen K. Weil any alimony and he wanted to provide some support money for her for a reasonable period of time. He, therefore, suggested that if the defendant and cross-complainant, Helen K. Weil, were

so inclined she could amend her complaint to pray for a divorce, which he would grant her, together with alimony at the rate of $300.00 per month, for a period of thirty (30) months. The Judge also said that in any event he was satisfied from the evidence that Helen K. Weil had voluntarily and without duress or coercion or any false promises, deeded back her interest in the property at 533 Spoleto Drive to Felix J. Weil and, therefore, he would find that Felix J. Weil was the sole and exclusive owner of the whole interest in that property, free of any claims on the part of Helen K. Weil.

"As to the jewelry and furs, valued at some $18,000.00, given to her by her husband and subsequently returned to him, he would find, regardless of whether Helen K. Weil amended her cross-complaint to ask for a divorce or not, that these were still Helen K. Weil's property and he would order them to be returned to her, and would also allow her a maximum sum of $1000.00 for an operation if one is had by her; that he would award Mr. Whelan, attorney's fees in the sum of $6000.00, and to Messrs. Jennings & Belcher and Sigurd E. Murphy, who had, during the course of the trial (at a hearing in Chambers in the presence of Mr. Whelan, Rudolph Pacht and myself), made application for an allowance for their services, the sum of $1500.00.

"I protested to Judge Baird that on the evidence in the case, our client, Felix J. Weil, was entitled to a judgment of divorce. I further protested to Judge Baird that the allowance to Mr. Whelan was excessive for the services rendered to him, especially in view of the fact that we had already paid $2500 attorney's fees to Mr. Sadicoff and a judgment was about to be given against Felix J. Weil for $1500.00 for services rendered by Messrs. Jennings & Belcher and Sigurd E. Murphy, and that our client was in effect being penalized for Mrs. Weil's arbitrary and unjustified discharge of her former lawyers. Judge Baird then replied that it was clear to him from all the evidence that he had heard and read in the case, that the legitimate objects of matrimony had been destroyed and that while he recognized the validity of my argument that we had proven a case entitling Felix J. Weil to a divorce, he still felt that he wanted to do something for Helen K. Weil in the way of support money until she could reconstitute her life; as to the attorney's fees of Mr. Whelan, he felt that this was a reasonable amount, to which I then replied that I would defer to the court's conclusion. I argued, however, that even if the Judge insisted upon granting the divorce to Helen K.

Weil, that he base the decree solely upon the allegations set forth in subdivision 2 of Paragraph II of the Second Cause of Action in the amended cross-complaint and that the court find all the other specifications of cruel conduct set forth in the said amended cross-complaint to be untrue. The Judge said he would so find, and Mr. Whelan agreed to have such findings made and to waive all other findings of fact and conclusions of law in the case.''

Once again it is to be, observed that the Whelan and Pacht affidavits are .not materially inconsistent. The Whelan affidavit makes no mention of the judge's conclusions on the merits of the case—nowhere is there any contradiction of the categorical averment by Pacht that the judge stated ''it was clear to him from the evidence'' that defendant's ''continued pressure and intrigue'' in her ''campaign to obtain for herself an interest in the trust funds'' of plaintiff was the ''basic cause'' of their marital differences, nor is there any contradiction of the further averment that the judge ''recognized the validity of my argument that we had proven a case entitling Felix J. Weil to a divorce.''

These statements are not only uncontradicted; they find strong support in the record. Following the judge's unsuccessful effort to bring an end to the trial on the twelfth day, the cross-examination of defendant was continued and additional misstatements and inconsistencies on her part were established. Notable among these were misstatements relating to the charge in her verified complaint that plaintiff had appropriated approximately $4,000 of her earnings as a school teacher in New York. Undisputed records of the New York Board of Education showed that she had earned only $704.50 in the period in question. Nor was even this amount appropriated. Following her endorsement of the salary checks they were deposited in the parties' joint account, on which defendant had the right to draw, and did draw, for whatever she needed.* Defendant's theory of ''appropriation'' was that plaintiff insisted that her checks be deposited in their joint

---

*''Q. You could draw whatever checks you wanted to on this joint bank account, couldn't you? A. Yes. Q. And you did? A. Yes.'' In a deposition, defendant had earlier testified as follows: ''Q. And you drew on the joint account? A. For housekeeping and—— Q. How much did it cost you to live during that period a month or per year? A. I don't know, but we certainly had ample. Q. How much? A. I don't know. Q. Out of that account you paid your household bills, your clothes? A. We traveled, yes. We lived well. Q. Everything for your joint benefit? A. Yes. Q. And in that account he put his money, too, his income? A. Yes.''

account in spite of her desire to give the money to her mother. It was established, however, that defendant had drawn checks to her mother's order during the period in question—a fact which defendant did not recall until the checks were exhibited to her. Moreover, her mother lived with the parties during most of their married life before their separation; at such times her expenses were paid by plaintiff, including medical expenses, and she was given in addition a monthly allowance of $100 by plaintiff, from which she saved approximately $900. It is not disputed that there was an affectionate relationship between plaintiff and defendant's mother.

Defendant also charged that plaintiff had forced her to decline a permanent appointment as a teacher in New York in order that she might devote herself entirely to his interests. A letter written by defendant at a later date showed, however, that this decision was reached jointly by the parties, that the appointment was declined so that defendant might devote herself not only to her home but also to her art studies, financed by plaintiff, and that at that later date defendant had "no regrets" about the action that had been taken—"I still think this decision was good."

Defendant also claimed that plaintiff would not permit her to have children. A gynecologist testified, however, that the parties had consulted him to determine why defendant had not become pregnant and that they had stated they had been trying to have children for a year. Office records substantiated his testimony.

Defendant's principal corroborating witness was her sister, Mrs. Mildred Green. In her testimony Mrs. Green unequivocally denied that she had advised defendant concerning evidence that should be produced or allegations that should be made or that she had written any letters to defendant in which she told her how to conduct the case. Such a letter was introduced, however; it was written to defendant shortly after plaintiff's complaint was filed and contained detailed instructions concerning evidence and allegations. Mrs. Green admitted that the letter was hers.

This letter is also noteworthy for its emphasis upon the trusts in which plaintiff's assets were held and upon defendant's activities concerning them. Plaintiff and defendant had first met through Mrs. Green, who was employed by the institute that held plaintiff's money, and who was therefore familiar with the persons and circumstances connected with the trusts. In her letter she states that defendant should contest the

divorce action and should show: "Husband alienated for very obvious reasons, as soon as you prevailed upon Lix [plaintiff] to retain control of his money—this provoked H [one of the Institute officials and a life-long friend of plaintiff]. . . . Your attorney should threaten to expose H. . . . Your attorney must also prove that you are not a gold-digger, you showed this by signing the deed to the house, etc. . . . Lix signed control of money to Institute—but Lix is still trustee and it still legally belongs to Lix. H. will try to bribe you. . . . State motives—why your marriage was interfered with from outside—intentional outside interference for very obvious reasons—at the very moment you tried to make Lix see the light. H & P [another Institute official and close friend of plaintiff's] are living on Lix' money. . . . It will be a hard fight but I think it is worth it. You may even win Lix back— for he is bound to sit up and take notice when people he has known for years testify in your behalf. It would be wonderful if you would crush these fiends. I hope this will prove helpful to you. I intend to see more people within the next few days and will keep you posted." The observations in this letter are in marked contrast to defendant's testimony that she did not urge plaintiff to withdraw his money and give up his friends. Significantly, the witnesses referred to in the letter were not called to testify in defendant's behalf.

In thus reviewing the record; we are not to be understood as having substituted our decision on the evidence for that of the trier of fact. ■ The matters we have discussed, however, are relevant to the question of fact that is presented to this court by defendant's appeal, namely, whether or not the trial court improperly coerced her. Defendant has submitted her affidavit to aid us in deciding that question, and we have therefore examined the record for indications of her credibility. We have also sought to evaluate, on the basis of the record, the uncontradicted claim of the Pacht affidavit that the judge had decided that defendant's financial intrigue was the cause of the marital rupture and that plaintiff was entitled to a divorce.

■ There can be no doubt that the judge's suggestion that defendant amend her cross-complaint induced her to do so, but there must be more to a claim of coercion than mere causation. If the judge believed from the evidence that plaintiff was entitled to a divorce, and if he so stated to counsel, then his suggestion was not, *as to defendant,* improper. The judge's remarks would constitute prejudicial misconduct only

if his announced intention to grant plaintiff a divorce were contrary to the facts of the case as he had decided them. Defendant has failed before this court to prove that fact. We have concluded, therefore, that defendant's amendment of her prayer and consent to the judgment were made to obtain alimony to which she would not otherwise have been entitled, and that she was persuaded to make that decision, not because of any prejudice or misconduct of the court, but because she had failed to establish her case.

Defendant relies upon the rule that an appellate court will not go behind the findings of fact in an effort to determine the trial court's true views on the evidence. Manifestly that rule can have no application to a situation where it is clear that the findings were entered solely to support what was in effect a consent judgment.

Defendant also points to the statement in the Whelan affidavit that the judge remarked that there was "enough evidence to justify him in granting a divorce to either party." This is a fair comment on the evidence from the standpoint of an attack by appeal, for the conflicting testimony of plaintiff and defendant made the decision on the facts depend largely upon the credibility of the witnesses. The judge's purpose in making this observation appears to have been to point out to counsel that if his suggestion were not followed and plaintiff were granted a divorce, defendant would probably be unsuccessful on appeal, but that if, by agreement, the divorce were given to defendant, it would have every appearance of evidentiary support. In our opinion this was an accurate description of the legal situation and was rendered with a view to assisting defendant in making her decision.

It is apparent from the proposal made by the trial judge, and from his other comments, that he believed a divorce was the only satisfactory solution to the problems presented in the marital tragedy that confronted him. His statement that "it was clear to him from all the evidence that he had heard and read in the case, that the legitimate objects of matrimony had been destroyed" is conclusively supported by the record. The evidence shows that the marriage of the parties began with mutual affection and happiness, but that arguments and misunderstandings, largely over financial matters, became increasingly frequent and acrimonious. The physical health of both parties has become seriously impaired. Family, social, and even business relationships have been disrupted. No prospects of reconciliation remain—the final separation

followed earnest efforts to overcome differences and live peacefully together. Since the filing of the complaint the activities of the parties have degenerated into a legal battle, characterized by extravagant and embittering charges, and in which the only remaining consideration of importance is money. We cannot ignore the important "social considerations which make it contrary to public policy to insist on the maintenance of a union which has utterly broken down." (*Blunt* v. *Blunt*, [1943] A.C. 517, 525 (H.L.), 169 L.T.R. 33, 34; *Hill* v. *Hill*, 23 Cal.2d 82, 93 [142 P.2d 417].)

The authorities cited by defendant are not inconsistent with the result here reached. In *Webber* v. *Webber*, 33 Cal.2d 153 [199 P.2d 934], where the wife sought and was granted a divorce, part of her case was unquestionably prejudged. The trial court announced, before any of the wife's evidence was presented, that "anybody can get a job now . . . men or women" and that he would not consider an award of alimony. Her attorney introduced evidence of her physical condition and living expenses, but the judge several times declared it was "a waste of time." Early in the trial, when the husband offered to withdraw his cross-complaint if the wife would waive alimony, the judge stated that her waiver would be unnecessary because "the Court will waive it himself." The husband rested without presenting evidence. This court reviewed the wife's case, including the fact that the parties had been married many years and that the wife was beyond middle age and without experience other than as housewife and mother, and it was concluded that the evidence would have supported an award of alimony and that the wife was therefore prejudiced by the court's refusal to consider her claim.

In *Del Ruth* v. *Del Ruth*, 75 Cal.App.2d 638 [171 P.2d 34], the trial court refused to consider many of the material allegations made by each party and at the outset limited the proof of cruelty to the two or three years immediately preceding separation, although the parties had been married over 20 years. Also, at one point in the trial, the judge called the wife to his chambers and expressed reluctance to grant separate maintenance; no attorneys were present at this conference and the affidavits regarding the details of what took place do not appear in the opinion. The trial court ultimately gave a divorce to the husband on the basis of the wife's cruelty but nevertheless awarded her three-fourths of the community property. In reversing the judgment, the appellate court expressly refused to speculate whether or not the judge might

have allowed his opposition to separate maintenance to color his judgment; his remarks regarding separate maintenance were referred to solely in connection with the question whether or not the wholesale exclusion of issues had been prejudicial error. As in the Webber case, there was no suggestion of consent to the judgment.

In *Wuest* v. *Wuest*, 53 Cal.App.2d 339 [127 P.2d 934], the wife brought an action in equity to modify a property stipulation that had been made a part of an earlier divorce decree. She alleged that she had agreed to the stipulation but that in other respects her attorney had exceeded his authority in waiving her rights and that she was not advised of the legal effect of her consent. She also alleged that she had proved a cause of action for divorce on the ground of her husband's physical cruelty and that when she agreed to the stipulation, she was sick in mind and body as a result of his beatings and the court's enforced psychiatric examinations. She further alleged that the trial court had threatened to deny the divorce, so that she would have been forced to return to her husband, unless she consented to the stipulation. For purposes of demurrer these allegations were assumed to be true, and the appellate court held a cause of action in equity had been stated.* The facts alleged in the Wuest case are markedly different from those now before us. Here, defendant's attorney did not exceed his authority, nor had defendant established a cause of action entitling her to a divorce. It is true that defendant's affidavit alleges that she was "harassed, nervous, upset and distraught," but she has pointed to no persuasive evidence that she was not mentally qualified to make her decision. In the Wuest case the wife's mental condition was recognized as doubtful even during the trial; here there appears at most to have been only the nervousness that many litigants feel while in court. Moreover, both the trial judge and defendant's counsel advised her concerning the legal effect of her consent.

In *Rosenfield* v. *Vosper*, 45 Cal.App.2d 365 [114 P.2d 29], it was held that the trial judge acted improperly in stating during settlement discussions that a particular amount ap-

*After a trial, in which it was found that all the wife's allegations were true, a judgment modifying the property agreement was affirmed on a second appeal. (72 Cal.App.2d 101 [164 P.2d 32].) The appellate court observed that it could not "enthusiastically agree" that the evidence of fraud preponderated in the wife's favor, but that there was "substantial" evidence to support the findings.

peared reasonable and in urging the defendant to settle at that figure. The defendant refused, and the judge later decided the case on the basis of a much higher amount. The appellate court was impressed by the fact that after the judge's comments the plaintiff amended his prayer; the amount ultimately allowed by the judge exceeded what was originally asked by the plaintiff. The opinion of the dissenting judge shows, furthermore, that even under those circumstances the court had difficulty in deciding whether or not the judge had acted improperly.

Each of the cited cases in which trial judges have been found guilty of misconduct (see also *Pratt* v. *Pratt*, 141 Cal. 247 [74 P. 742]; *Bell* v. *United States*, 9 F.2d 820) has differed substantially from the others; none of them can be a controlling precedent in a new situation in which new fact questions are presented. Differences in the nature of the litigation, the particular comments or conduct of the trial judge, the scope and reliability of affidavits by parties and attorneys, and the state of the evidence at the trial make it essential that each case turn upon its own facts.

Defendant's second major contention relates to an independent claim that a deed executed by her granting to plaintiff her interest in the family home in Santa Monica was obtained through undue influence. She contends that under no theory of the evidence could the trial court decree the deed to be valid; if this contention is sound, it was error for the judge to advise her, at the time he suggested that she amend her prayer, that he had decided to award the house to plaintiff. Defendant concedes that if there were conflicting evidence on this issue, the court might properly have ruled in plaintiff's favor, and she also states that "it may be" that on the issue of actual fraud the evidence was in conflict. She argues, however, that even the testimony of plaintiff himself raises a presumption that the deed was obtained by undue influence (see Civ. Code, §§ 158, 2235) and was therefore a constructive fraud.

The house in question was purchased with plaintiff's separate funds, but title was taken in the names of plaintiff and defendant as joint tenants. According to plaintiff's testimony, defendant complained insistently about plaintiff's financial affairs and urged him to exercise invasion rights in certain trusts into which he and his father had deposited funds. Plaintiff was satisfied with these trusts, however, and with the research work of the institute for whose benefit they had

been established. He therefore refused defendant's demands that he transfer several hundred thousand dollars to the joint bank account of the parties. From time to time quarrels occurred regarding these financial matters. There were other quarrels over furs and jewelry, and on several occasions he acceded to her wishes and purchased them for her.

Plaintiff further testified that defendant eventually sought to dispel the impression that she was a "gold-digger." On one occasion she proposed to leave him, and on her own initiative she wrote and signed a paper giving back to him the house and the furs and jewelry, and waiving any right to support; this document was introduced at the trial. Plaintiff refused this offer and regarded it as but an incident of a quarrel. Later, however, after further arguments on the same subject, defendant again offered to deed him the home and on this occasion he accepted; but defendant then refused to sign the deed. By this time plaintiff was genuinely apprehensive concerning defendant's interest in his finances.

At this juncture, the parties had their first separation, and shortly thereafter plaintiff went to New York to attend a meeting of the American Economic Association. Defendant followed, and they met at the home of her sister, Mrs. Green. A discussion of their future ensued, and, as evidence of her good faith in financial matters, defendant again proposed to deed her interest in the home to plaintiff. Plaintiff mailed the deed to her the next day, and she executed it without again consulting with him; it was acknowledged before a notary and in the presence of Mrs. Green. At the next meeting of the parties, defendant delivered it to plaintiff. Plaintiff then returned to California, and it was agreed that he would send for her if he should decide that another attempt to live together might be successful. According to plaintiff, defendant stated that she too desired at least a temporary separation, and she admitted that she had been at fault and that plaintiff had grounds for divorce. A few weeks later defendant suddenly returned to California, declaring that she had cancer. Although plaintiff had not yet come to a conclusion regarding a reconciliation and was in doubt concerning the genuineness of her claim that she had cancer, he admitted her to the house and they lived together several additional months before their final separation.

The evidence supports the trial court's conclusion that the deed was the voluntary and deliberate act of defendant, taken with full knowledge of the legal results involved, and

that plaintiff did not use his position as her husband to obtain the conveyance. ▆▆▆ It is true, as defendant contends, that when a husband secures a property advantage from his wife, the burden is cast upon him to show that there has been no undue influence. (Civ. Code, §§ 158, 2235; *Bryson* v. *Byrer*, 87 Cal.App. 320, 323 [262 P. 461]; *Combs* v. *Combs*, 75 Cal. App.2d 903, 904 [171 P.2d 949]; *Jorgenson* v. *Pardee*, 101 Cal.App.2d 96, 98 [224 P.2d 884]; see *Estate of Cover*, 188 Cal. 133, 143-144 [204 P. 583].) ▆▆▆ It is also true, however, that whether or not the spouse gaining such an advantage has overcome the presumption of undue influence is a question for the trier of fact, whose decision will not be reversed on appeal if supported by substantial evidence. (*Brown* v. *Canadian Industrial Alcohol Co.*, 209 Cal. 596, 599 [289 P. 613]; *Taylor* v. *Taylor*, 66 Cal.App.2d 390, 396-397 [152 P.2d 480]; *Combs* v. *Combs*, *supra*, 75 Cal.App.2d 903, 904-905.)

In only one of the many cases cited by defendant was the trial court's finding that there was no undue influence reversed. (*Gaines* v. *California Trust Co.*, 48 Cal.App.2d 709 [121 P.2d 28].) There it was proved that the wife had lived harmoniously with her husband for many years, had complete trust and confidence in him, and was accustomed to signing whatever legal papers he submitted to her without questioning or even reading them. One day he showed her his will and told her to sign it; when she asked why her signature was necessary, he said, "Edith, I am in a hurry. Sign this will." She immediately signed the document without examining it or having it read or explained to her and in ignorance of the fact that it contained a waiver of her community property rights and an election to take under the will a much smaller estate. There was no consideration for this act for her husband had no separate property to which she thereby obtained any rights. She was not informed of the effect of her signature until after his death, and at all times she was unfamiliar with legal and business matters and did not even know that her husband would leave a substantial estate. All of these facts were affirmatively established at the trial, and most of them were incorporated in the trial court's findings. It was held that under such circumstances the presumption of undue influence had not been overcome.

The facts in the present case are materially different. Defendant was not accustomed to relying on plaintiff's judgment in business affairs but was continually seeking to interfere in decisions concerning even his separate property. The deed

was signed and delivered at a time when the parties were discussing their separation and a possible divorce, so that defendant was aware that her interests and those of her husband were in conflict. She had ample opportunity to obtain independent advice, and the evidence shows that her sister, who admittedly had advised her about her relations with plaintiff and who has since advised her in this lawsuit, was with her when the deed was acknowledged (see *Brown* v. *Canadian Industrial Alcohol Co.*, 209 Cal. 596, 599 [289 P. 613]); the deed was executed during a three-day period in which plaintiff did not see defendant. Defendant fully understood the nature and legal effect of the step she was taking, and in fact it was she who proposed it.

▇▇▇ Defendant contends that the evidence conclusively shows that her deed was improperly exacted by plaintiff as a condition to reconciliation. There is evidence which, if believed by the trial court, would support such a conclusion, for during the period when defendant executed the deed, the parties extensively discussed their separation and plaintiff agreed to reconsider his decision to seek a divorce. That evidence does not compel the conclusion that plaintiff improperly refused a reconciliation, however, in view of the fact that there was other evidence that defendant had been to blame for the marital discord (see *Taylor* v. *Taylor*, 66 Cal.App.2d 390, 395, 398 [152 P.2d 480]; *Young* v. *Cockman*, 182 Md. 246, 253 [34 A.2d 428, 432, 149 A.L.R. 1006]), that she admitted her fault, that she herself desired at least a temporary separation (*cf.* Civ. Code, § 159), that she offered on her own initiative to execute the deed, that plaintiff had paid for the house, and that the parties had always regarded it as his. Although defendant's apparent contrition and promises of reform, together with her renunciation of any technical claim to property thought of as plaintiff's may well have led to his belief that a divorce might be unnecessary, nevertheless he made it clear that his consent to reconciliation would depend solely upon whether or not he should ultimately feel, after a period of rest and meditation, that a harmonious life with defendant was possible. There was ample evidence to justify the conclusion that any pressure on defendant to execute the deed was the result of her past conduct and not undue influence by plaintiff. Plaintiff did not demand the deed as a condition of his reconsideration; rather defendant voluntarily offered it as evidence of the sincerity of her promises to reform.

█ Finally, it is urged that the trial court's award of the house to plaintiff is inconsistent with the award of the furs and jewelry to defendant. Defendant testified that she executed and delivered the deed to the house but did not deliver or agree to deliver the furs and jewels. Moreover, plaintiff's statement that defendant made a "gift" of the furs and jewels was largely a legal conclusion based upon evidentiary details relating to donative intent, delivery, and acceptance; on the extensive evidence that was introduced on this issue, the trial court may well have reached a contrary conclusion. The differing circumstances under which plaintiff had originally made these gifts to defendant were also relevant to the claim that plaintiff's later conduct was unconscientious; there was evidence that although the house was in joint tenancy it was regarded as plaintiff's property, whereas the furs and jewels were given to defendant for her use and usually on special occasions such as wedding anniversaries.

In addition to her appeal from the judgment, defendant has appealed from orders denying counsel fees and costs for the new trial motion and for appeal.

It is not disputed that plaintiff is able to pay for the reasonable value of the services rendered by defendant's present attorneys, nor is it denied that defendant is without funds. Plaintiff claims, however, that defendant's attack upon the judgment has not been made in good faith.

█ It is elementary that the right to counsel fees on appeal is not dependent on proof that the judgment is erroneous. (*Gay* v. *Gay*, 146 Cal. 237, 240 [79 P. 885].) Our affirmance of the judgment, therefore, does not necessarily require an affirmance of the orders denying such fees. █ For the same reason, defendant's consent to the judgment does not bar her right to seek attorney fees, for the principal issue on appeal is whether or not that consent was coerced. The essential question is whether or not defendant prosecuted the appeal in the belief, held in good faith, that she had reasonable grounds for seeking a reversal. Affidavits of her attorneys were submitted stating that they had carefully examined the record and the pertinent legal authorities and that they believed, and therefore had advised defendant, that the appeal involved meritorious grounds of contest and offered substantial hope of success. At the hearing on the motion, the sincerity of these affidavits was expressly conceded. █ The question of counsel fees is addressed to the sound discretion of the trial court. (*Kellett* v. *Kellett*, 2 Cal.2d 45, 48-50 [39 P.2d

203].) In rare instances, however, an order denying fees will be reversed where it is shown that the appeal presents "debatable questions which were not without substantial merit or controversy." (*Norris* v. *Norris*, 50 Cal.App.2d 726, 735 [123 P.2d 847].) We believe this to be such a case.

 Plaintiff contends that the allowance of $6,000 to defendant's trial attorney included compensation for a motion for new trial. The trial court believed, however, that a final agreement in the case had been reached and therefore did not contemplate that such a motion would be made. In determining the amounts that should be awarded for services of counsel, the trial court will take into consideration the fact that the preparation for appeal necessarily duplicated much of the preparation for the new trial motion and was performed by the same attorneys.

The judgment is affirmed. The stay of execution is discharged and the petition for supersedeas is dismissed. The orders denying counsel fees and costs for the new trial motion and for appeal are reversed, and the trial court is directed to allow reasonable sums therefor.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., and Spence, J., concurred.

SCHAUER, J., concurring and dissenting.—I concur in the affirmance of the judgment but on the entire record would also affirm all orders from which appeal is taken.