[Civ. No. 4282.   Fourth Dist.   June 27, 1952.]

JAMES T. PARTRICK, Appellant, v. MARJORIE L. PARTRICK, Respondent.

Myers & Martin and John F. Martin for Appellant.

William S. Warden for Respondent.

GRIFFIN, J.—Plaintiff brought this action for annulment of marriage against defendant upon the ground that at the time of the purported marriage ceremony between them defendant was married to one Charles Orr, from whom she had only obtained an interlocutory decree of divorce. The final decree was obtained on April 7, 1941, about six months after the marriage. These facts are conceded. Defendant showed that she married Orr in 1922, and due to his being a chronic alcoholic, leaving home for short periods of time and committing acts of cruelty upon her, she divorced him in 1934. She obtained custody of their minor son. Thereafter, a reconciliation was partially effected. The parties remarried on June 11, 1936. Within a week, Orr again went on one of his usual "tantrums." He again disappeared. Defendant testi-

fied that since Orr had been gone two or three years and due to the fact that he traveled under assumed names, slept in questionable places, was in poor health, did not return within a few weeks as he usually did, did not make his usual call to see his mother, to whom he was very close, did not return to attend her funeral, and due to the fact that his mother received word from some friends who knew Orr and that this friend heard of a train accident wherein someone was killed who answered Orr's description she, and all the family, definitely believed or felt that Orr was dead. Defendant consulted a lawyer who advised her she must wait seven years before she could judicially establish a record of his death and remarry upon the claim of presumption of death, or she could file for divorce and secure service by publication. About the month of August, 1939, she filed for divorce and an interlocutory decree was entered March 29, 1940.

Through advertisement (Lonely Hearts) plaintiff Partrick met defendant the first week in September, 1940. Plaintiff claims defendant told him she was a widow. On October 5, 1940, they were married. Defendant testified on many occasions that she then felt and believed that her husband was dead and that she entered into the marriage ceremony in good faith believing she had the legal right to do so; that when the year was up she had the final decree entered as a matter of precaution.

Apparently both parties entered upon the matrimonial venture in good faith. Plaintiff, according to his story, was possessed of a residence costing less than $4,000, upon which he had paid about one-half; he had about $700 in the bank and a claimed $1,300 in cash, which he said he carried in his pocket. He also owned a 1937 Ford, and during their 11 years of married life, he claimed he inherited about $3,000 from his father's estate.

Defendant fixes the purchase price of the real property at $3,000 to $3,500, and claims that plaintiff owed $2,300 on it when they were married; that all plaintiff had was about $700 in the bank and a 1937 Ford; and that the inheritance was only about $1,000; that she had household furniture and a refrigerator valued at $450, and on which $40 was yet due; that they started housekeeping and Mr. Partrick was working as a production engineer in an aircraft accessory business and, at times, earned as much as $750 per month; that they agreed to pool their property and efforts, to live economically, save their money, and put it in savings bonds; that when he was

making $350 per month they would save at least $200 and purchase bonds with it "for our future life together."

Plaintiff testified that shortly after their marriage they discussed their savings program; that "the idea would be to build this property and sell it and get some more property and go to another one and sell it"; that at that time he "intended for her to participate in that property" as his wife; that it was his feeling that whatever they were able to accumulate should be equally hers and his; and that that was the plan they were operating under. Thereafter, in 1945, the real estate was sold for $6,150. About $6,000 was invested in a farming enterprise, which was later sold without a profit. The proceeds were invested in another property which was improved in 1947, and sold for $9,000. Five thousand dollars was still due plaintiff and defendant thereon under a deed of trust in their favor.

They acquired and improved a piece of property in Cardiff, which at the time of trial stood in plaintiff's name and which was partially completed. It was valued at $6,800. The accumulated defense bonds amounted to approximately $9,900 (face value) and title was taken by the parties in joint tenancy. Title to the real estate, other than that otherwise indicated, was taken in their joint names. After about 10 years, defendant's son received a card from his father, Mr. Orr, informing him of his whereabouts, but requesting the son not to tell his mother or his relatives of this fact. Later, the son informed his mother that Mr. Orr was alive. Defendant claims she later related the entire circumstances to plaintiff; that she suggested that plaintiff and she remarry if there was any question in his mind about the validity of their marriage; that he said: "You know the legal end of it doesn't mean a thing to me."

January 12, 1951, plaintiff filed this action for annulment. Defendant answered and by way of cross-complaint asked that the validity of her marriage to plaintiff be determined, for a divorce, and that an equitable division of the property acquired by them be made. After hearing, the court found generally in accordance with the facts stated, granting plaintiff the annulment, and especially found that:

"It is true that the defendant entered into the marriage with plaintiff as aforesaid in good faith, genuinely believing her former husband, Charles Orr, to be dead, and continued in such good faith and genuine belief during all of the time during which said joint estate was acquired. . . .

"It is true that the labor and efforts of the defendant contributed equally with those of the plaintiff to the acquisition and accumulation of the property in issue. . . .

"It is true that at the time of the marriage of the parties as aforesaid, or shortly thereafter, they expressly agreed to pool their earnings, labor and efforts and to share equally in all properties acquired or accumulated as the result thereof; and that thereafter, and during all of the time in which said property was acquired, said agreement remained in full force and effect, and was carried out and completely performed by the parties."

The court ordered the real property, trust deed, and savings bonds sold or cashed and the proceeds divided equally.

Plaintiff takes issue with the last mentioned special findings upon the claim that they are not supported by the evidence; that the undisputed evidence shows that there was no impediment to marriage insofar as plaintiff was concerned; that in good faith, he married defendant who had told him she was a widow and who never had told him the true circumstances; that believing she was actually and truly his wife, and by reason thereof, plaintiff intended that she share as a wife in his property and accumulations; that the evidence does not show any express agreement between them to the effect that she was to share equally in the property, earnings and accumulations; that even if there was such evidence, it clearly was made upon his part solely and only because of his belief and reliance upon the existence of an actual and valid relationship with her; that defendant is entitled to no share of the property or accumulations in the absence of proof that there "is a *bona fide* belief on the part of the 'wife' in the existence of a valid marriage." (Citing *Flanagan* v. *Capital National Bank,* 213 Cal. 664, 666 [3 P.2d 307]; *Sanguinetti* v. *Sanguinetti,* 9 Cal. 2d 95 [69 P.2d 845, 111 A.L.R. 342]; *Vallera* v. *Vallera,* 21 Cal.2d 681 [134 P.2d 761]; and *Bacon* v. *Bacon,* 21 Cal.App.2d 540 [69 P.2d 884].)

Defendant points out that the parties attempted to contract a ceremonial marriage, engaging in a civil marriage ceremony pursuant to a license regularly issued; that defendant testified no less than 16 different times during her direct and cross-examination that at the time of the purported marriage she believed her former husband to be dead and hence that she was able to contract matrimony; that at the time of the marriage of the parties, and prior thereto, it was generally reputed among the members of Mr. Orr's family, including his parents,

that he was dead; that the parties lived together as husband and wife for over 11 years, both believing during that time that a valid marriage existed; that the fact that there may have been other evidence introduced from which it might be inferred that the respondent had no genuine belief in the death of her former husband presents nothing more than a conflict in the evidence and the finding of the trial court on conflicting evidence may not be reviewed. The conclusion of the trial court in this respect is reflected in his written opinion wherein he states:

"Her (defendant's) conduct from the date of her marriage to Mr. Partrick has been that of a faithful, sincere and earnest wife and business partner, and strongly supports her sworn testimony that she believed Mr. Orr to be dead, and this, notwithstanding the fact of her divorce action from the latter, and the advice of her counsel incident thereto. I can find no reason in the record to deny her the fruits of her honest, but misguided efforts."

The evidence amply supports the finding that the respondent believed a valid marriage existed. Likewise, the evidence amply supports the finding of an agreement between the parties to share equally in the accumulations of property. From the evidence it appears that there was at least an implied agreement and plan for the parties to share jointly in their accumulations; that the agreement and plan were actually carried out in detail by the purchase of various items of property in joint tenancy; that defendant assisted plaintiff in every way to save and accumulate the funds which were invested in the properties now owned by them; that she actually assisted plaintiff in the manual work of house construction, managed the housework, and cooperated with plaintiff in accumulating the property through their joint efforts and by commingling their separate property.

In *Vallera* v. *Vallera, supra,* where plaintiff brought an action for separate maintenance and for a division of community property against the man with whom she had been living as his wife, it was said that

". . . a woman who lives with a man as his wife in the belief that a valid marriage exists, is entitled upon termination of their relationship to share in the property acquired by them during its existence"; and that "The proportionate contribution of each party to the property is immaterial in this state . . . for the property is divided as community property would be upon the dissolution of a valid marriage";

that "The essential basis of a putative marriage, however, is a belief in the existence of a valid marriage"; and "If a man and woman live together as husband and wife under an agreement to pool their earnings and share equally in their joint accumulations, equity will protect the interests of each in such property." (Citing cases.)

From a reading of plaintiff's briefs, it would appear that he would have this court weigh the evidence and arrive at a different conclusion from that of the trial court and ignore the evidence favorable to defendant. If the trial court had found in favor of plaintiff on the issues presented, a different question would here arise. The appellate court is bound to accept as true the evidence of the defendant and the favorable inferences adduced therefrom. (*Bank of Italy* v. *Cadenasso,* 206 Cal. 428 [270 P. 931, 274 P. 536]; *Tedder* v. *Johnson,* 105 Cal. App.2d 734 [234 P.2d 149].)

Judgment affirmed.

Barnard, P. J., and Mussell, J., concurred.