[Civ. No. 4802.   Fourth Dist.   Nov. 5, 1953.]

CARRIE PATTERSON, Appellant, v. RUBIE LEE DAVIS, as Executrix, etc., Respondent.

James A. Gardner for Appellant.

J. W. Fleming for Respondent.

GRIFFIN, J.—Consolidated actions to set aside a deed and to recover for alleged services performed.

Jesse Patterson married his wife Callie in 1915. They took to live with them as their own child, defendant Rubie Lee Davis, Jesse's niece. In June, 1939, Jesse bought, on contract, a house and lot (the subject matter of this action) for $300, payable $10 per month. Title thereto was to be vested in Jesse and Callie's names. They moved into the house, which consisted of one bedroom and two other smaller rooms.

In July, 1939, Callie left Brawley, where they had been living, and went to Arkansas on account of her health or for a visit. It appears from the evidence that plaintiff Carrie Patterson knew Jessie and his wife in Arkansas, and some question arose as to the extent of the friendship between Jesse and plaintiff at that time. After Callie left for Arkansas apparently Jesse contacted plaintiff and she came to Brawley to live with him as his housekeeper or in some such capacity. The evidence is not too clear as to what knowledge plaintiff

had as to Jesse's marital status at that time. She testified Jesse told her that he and his wife had broken up and he "had sent her home for keeps"; that when she came out here she knew "he wasn't free" to marry her because Jesse told her that; that she didn't know, as a fact, that Jesse and his wife were actually married when she knew them in Arkansas because she was not there at the time of the wedding. Plaintiff's counsel then stipulated that they were, in fact, married. Considerable evidence was offered that plaintiff did know that at the time she was living with Jesse and at the time she married him, he had not been legally divorced. It affirmatively appears from the testimony that before plaintiff's marriage to Jesse she was living with him; that Jesse was a deacon in the colored church and some kind of an indignation meeting resulted in a visitation, wherein Jesse was asked as to his marital status and why he was living with plaintiff when he had not divorced his former wife, and that he was told to "straighten it out"; that plaintiff called one of the members of the church on the phone and stated to her that although she (plaintiff) was not there that night she had learned about such visitation and the complaint. One witness testified that she went to Arkansas with Callie because she was sick, and stayed there about a month, and when she returned Carrie was rooming with another lady, but about a month after that Carrie moved into Jesse's house and it was in April, 1940, that they had him up in the church for living with her while they were unmarried.

It appears that in December, 1939, Jesse brought an action against Callie for divorce. Service of summons was by publication. An interlocutory decree was not entered until December 20, 1940, and during the intervening time plaintiff lived in the home with Jesse.

It is plaintiff's testimony that after the entry of the interlocutory decree, Jesse represented to her that he had been divorced and was free to marry her; that she believed these representations and they were married on January 14, 1941, about 25 days after the entry of the interlocutory decree; that they lived together as husband and wife; that they both worked and contributed their earnings and personal labor to the household, and certain improvements were made to the property here in question.

On September 2, 1943, a final decree of divorce was entered, but it was dated *nunc pro tunc* as of January 8, 1942. Only the one ceremonial marriage took place between the parties.

No valid marriage ever existed and counsel for plaintiff so stipulated at the trial. Plaintiff testified that she believed at the time of her marriage that Jesse had been legally divorced from Callie; that at the time Jesse obtained his final decree he brought the document to her and she inquired of him as to what that meant and whether or not they would have to be remarried, and he assured her they did not. She testified she was not familiar with the law and never saw a lawyer about it and did not learn until after Jesse's death, which occurred on April 2, 1950, that the marriage was invalid.

The parties lived together as husband and wife for more than nine years. Payments on the property here involved were completed in July, 1943, and title was vested in Jesse and Callie. Jesse and Carrie purchased another home adjoining this property and title was held in their names as joint tenants. It appears that Callie later returned to Brawley and found that Carrie and Jesse were living together as husband and wife; that Jesse obtained from her a quitclaim deed of her interest in the property here involved on consideration that Jesse would provide in his will for a disposition of that property to decedent's niece whom they raised and to whom Jesse was financially and morally obligated.

On December 7, 1943, Jesse executed a grant deed of the property here involved to himself and plaintiff Carrie, as his wife, as joint tenants. On January 13, 1948, Carrie Patterson executed a quitclaim deed thereto to Jesse, reciting a consideration of $10. This is the instrument plaintiff seeks to cancel in this action on the ground of fraud and undue influence. On January 17, 1948, Jesse executed his will in which he devised to defendant Rubie Lee Davis the real property here in question, and for some reason devised therein the adjoining property held by himself and Carrie as joint tenants, to his "wife, Carrie Patterson." It appears that the quitclaim deed here in question and the will were prepared by an attorney and that both Jesse and Carrie were present in his office when their provisions were being discussed and that both parties appeared before a notary public where the quitclaim deed was acknowledged. Plaintiff claims she did not understand the nature of the transaction, that the will was not mentioned, and also claimed that the blanks in the quitclaim deed were not filled in when she signed it; that she did not understand that she was divesting herself of her interest in the property; that she was not familiar with the practices

of the business world and did not have the benefit of independent legal advice.

As opposed to this claim, the attorney testified that in plaintiff's presence Jesse stated that he wanted to prepare a deed and a will; that he brought plaintiff with him because she had an interest in the matter; that he and his wife Carrie owned this property and that they had agreed that she would transfer her interest in it to him and he would leave a will by which he would devise the property to his niece because he was under obligation to her; that plaintiff participated in the conversation and approved the transfer and offered no objection; that subsequently the deed and will were executed and returned to him and the deed was then recorded; that in 1950, when he learned of Jesse's death, he wrote to plaintiff and Mrs. Davis notifying them of his possession of the will; that these ladies came to his office together and that they discussed the terms of the will and no objection was voiced by either; that plaintiff wanted to know the procedure necessary to obtain title to the house in which she then resided; that he advised her it would come to her under the terms of the joint tenancy deed and she never made any claim to the property here in question.

Rubie Lee Davis testified that her uncle practically raised her; that he was unable to read or write; that Carrie attended to all business transactions for him; that she was in the home when Jesse and Carrie were living together as husband and wife in 1948; that Carrie said to her: "Rubie . . . I don't know whether he's (Jesse) told you or not, but I have signed off of the old place and he wants to will that to you. . . . We built a new home and that's mine because I don't want no part of the old place that belonged to he and Callie, and I have signed over that, and that is for you . . ."; and that he was going to will it to Rubie; that when they went to the attorney's office plaintiff had a copy of the will with her; that her uncle had previously shown it to her; that the attorney explained to plaintiff that under the will plaintiff would "get her house" and Rubie would "get" hers; and that plaintiff then raised no objection. Another witness testified that plaintiff told her she knew of the transaction involving the quitclaim deed and will; that she stated: "Yes, I know he willed it to her (Rubie) because I signed the paper . . . I signed it because I didn't have nothing to do with that lot, him and Callie bought that lot and that's why I signed . . ."

By plaintiff's first amended complaint in action No. 26490, in the first cause of action she seeks $3,000 by way of damages for shock, humiliation and mental suffering by reason of the claimed false representations of Jesse Patterson to induce her to enter into an invalid marriage with him. In the second cause of action she claims she was by such false representations induced to live with Jesse and was, by reason of the invalidity of the marriage, deprived of her normal expectancy and property rights as a widow, to the value of $3,000. In a third cause of action she alleges that by reason of his false representations, for a period on nine years she rendered services to Jesse as a companion, cook, and housekeeper, and that he promised to pay her the reasonable value thereof in the sum of $3,300. It was admitted that plaintiff filed no claim in his estate in reference to any of these causes of action. In action No. 26479, plaintiff seeks to set aside the quitclaim deed above mentioned.

The trial court found generally in favor of defendant and specifically found that about September, 1939, plaintiff and decedent, without participating in a marriage ceremony, commenced cohabiting, although at said date decedent was the legal spouse of Callie Patterson and this fact was known to plaintiff; that the marriage of decedent and Callie Patterson was not terminated by a final decree of divorce until January 8, 1942; that decedent was an ignorant and uneducated person who could neither read nor write, and he imposed great faith and confidence in plaintiff; that plaintiff was able to read and write and decedent left the transaction of a great deal of their business in the hands of plaintiff; that plaintiff had her own separate bank account and handled her own affairs; that during said marriage decedent did not exert influence or control over plaintiff and plaintiff at all times exercised her own free will in business matters; that the matter of conveying the interest of plaintiff in said real property to decedent had been agreed upon between plaintiff and decedent prior to their visit to the attorney; that plaintiff executed the quitclaim deed to decedent before a notary public who acknowledged the said execution; that plaintiff gave said deed with a full understanding of the nature and legal significance of her action; that it was fully disclosed to her and she comprehended that by the giving of said deed she would have no interest whatsoever in said real property; that the execution of said deed by the plaintiff was without the coercion, undue influence or fraud of the decedent; that plaintiff re-

ceived no consideration from decedent by reason of her execution of said quitclaim deed; that plaintiff executed it without any false or fraudulent representations on the part of the decedent, and no representations were made to plaintiff by decedent with intent to deceive her, and she was not deceived; that it was not true that plaintiff was ignorant of the invalidity of her marriage to decedent until after his death; that it was not true that between January 14, 1941, and May 2, 1950, or at any other time, plaintiff rendered and performed services as a companion or cook or housekeeper to decedent at his special instance or request or that decedent promised to pay to plaintiff the reasonable value of any services rendered by her to him; that plaintiff failed to file a creditor's claim in the probate proceedings in the estate of decedent and that all allegations set forth in plaintiff's amended complaints in these consolidated actions inconsistent with the findings of fact herein are untrue. The judgment was that plaintiff take nothing by these consolidated actions.

The well prepared but voluminous brief of counsel for plaintiff on appeal presents nine separate questions. (1) It is claimed that a fiduciary relationship was created between plaintiff and Jesse even though there was no valid marriage, citing such cases as *Holmes* v. *Holmes,* 98 Cal.App.2d 536 [220 P.2d 603]; and *Fieg* v. *Gjurich,* 163 Cal. 740 [127 P. 49]. (2) That accordingly, a presumption of fraud and undue influence arose and that inadequacy of consideration alone was sufficient to raise the presumption, citing such cases as *Brison* v. *Brison,* 90 Cal. 323 [27 P. 186]; *Bacon* v. *Soule,* 19 Cal.App. 428 [126 P. 384]; and *Sparks* v. *Sparks,* 101 Cal. App.2d 129 [225 P.2d 238]. (3-4) That the evidence did not dispel or overcome the presumptions mentioned, citing such cases as *McKay* v. *McKay,* 184 Cal. 742 [195 P. 385]; *Nobles* v. *Hutton,* 7 Cal.App. 14 [93 P. 289]; *Estate of Miller,* 16 Cal.App.2d 141 [60 P.2d 492]; *Smith* v. *Lombard,* 201 Cal. 518 [258 P. 55]; and *Bank of America* v. *Crawford,* 69 Cal. App.2d 697 [160 P.2d 169]. (5) That the evidence did not show any bad faith of plaintiff in marrying decedent. (6) That even though the original contract of purchase of the property was executed by decedent and his former wife, plaintiff still had an interest in the property. (7) That the evidence establishes, as a matter of law, that plaintiff executed the conveyance under a basic mistake of fact, believing she and decedent were husband and wife, and that she did not have independent advice, citing *Ross* v. *Conway,* 92 Cal. 632 [28 P. 785]; *Her-*

*bert* v. *Lankershim,* 9 Cal.2d 409 [71 P.2d 220]; and other cases. (8) That she is entitled to restitution for her services which she performed and to hold otherwise would unjustly enrich defendant, citing *Lazzarevich* v. *Lazzarevich,* 88 Cal. App.2d 708 [200 P.2d 49]. (9) That it was not necessary, under the facts in this case, to file a creditor's claim in the estate, citing such cases as *County of Los Angeles* v. *Security First Nat. Bank,* 84 Cal.App.2d 575 [191 P.2d 78]; and *Burdick* v. *Kerkovecz,* 81 Cal.App. 786 [254 P. 684].

■ Considering points (1) to (5) inclusive, assuming that a confidential relationship may exist under certain circumstances between parties living together as man and wife, although there is no valid marriage (*Gatje* v. *Armstrong,* 145 Cal. 370 [78 P. 872]) the mere relationship alone, in a business transaction between them, will not taint it with suspicion of undue influence or fraud. (Civ. Code, § 158; *McDougall* v. *McDougall,* 135 Cal. 316 [67 P. 778]; *Donze* v. *Donze,* 88 Cal.App. 769 [264 P. 294]; 6 Cal.Jur. 76, § 44.)

■ Before the presumption may arise the facts must first show that a confidential relationship did exist. Secondly, that that confidential relationship was violated and the relationship was used to obtain an unfair advantage. (*Dimond* v. *Sanderson,* 103 Cal. 97 [37 P. 189]; 9 Cal.Jur. 236, § 111.)

Assuming that the evidence might support a finding of confidential relationship and that a presumption of undue influence or fraud might arise, the main question here involved is whether or not the evidence presented was in conflict with this claimed presumption and that accordingly the trial court was justified in finding from the entire evidence that there was no undue influence or fraud practiced upon plaintiff whereby she was induced to execute the instrument in question. ■ It is true, as plaintiff contends, that when a husband secures a property advantage over his wife the burden is cast upon him to show that there has been no undue influence. It is also true, however, that whether or not the spouse gaining such an advantage has overcome the presumption of undue influence is a question for the trier of fact, whose decision will not be reversed on appeal if supported by substantial evidence. (*Weil* v. *Weil,* 37 Cal.2d 770 [236 P.2d 159].) We conclude that the evidence fully supports the finding of the trial court. (*Kopner* v. *Fread,* 58 Cal.App.2d 114 [135 P.2d 634]; *Combs* v. *Combs,* 75 Cal.App.2d 903 [171 P.2d 949]; *Weil* v. *Weil, supra.*)

■ To overcome the presumption of fraud or undue influence it is not absolutely essential that there be evidence that the wife received independent legal advice if there has been a full and fair disclosure to her of all the facts essential to her protection, and she freely and voluntarily executes the conveyance. (*Estate of Brimhall*, 62 Cal.App.2d 30 [143 P.2d 891]; *Smith* v. *Lombard*, 201 Cal. 518 [258 P. 55]; *Marsiglia* v. *Marsiglia*, 78 Cal.App.2d 701 [178 P.2d 478].)

■ Considering questions 6 and 7, if plaintiff had some interest in the real property involved the evidence would support a conclusion that she intended making a gift of it to her husband for the purpose of his devising it by will to his niece upon his death (*Tillaux* v. *Tillaux*, 115 Cal. 663 [47 P. 691]; Civ. Code, § 1040; 9 Cal.Jur. p. 136, § 38). Where such conveyance was executed voluntarily, with knowledge of its contents, and with intent to convey, no consideration was necessary under section 1040 of the Civil Code. (*Lieman* v. *Golly*, 178 Cal. 544 [174 P. 33].)

The evidence as to whether plaintiff executed the instrument under a mistake of fact was conflicting, and fully supports the negative finding of the court in this respect. Accordingly, it may not be disturbed on appeal. (*Chichester* v. *Seymour*, 28 Cal.App.2d 696 [83 P.2d 301].) ■ In addition, plaintiff failed to plead mistake of fact. Such claim may not now be relied on for the first time on appeal. (*Quality Building & Sec. Co.* v. *Bledsoe*, 125 Cal.App. 493 [14 P.2d 128]; *Brandt* v. *Brandt*, 32 Cal.App.2d 99 [89 P.2d 171].)

Points 8 and 9 involve the claim for alleged services performed by plaintiff for decedent upon the allegations in the amended complaint that the decedent "then and there promised to pay plaintiff the reasonable value of such services." ■ Just what services plaintiff performed for decedent is not clearly shown by the evidence nor is there any evidence as to the reasonable value thereof *over and above the value of the support and maintenance furnished her by her supposed husband.* The one rendering the services has the burden of proving that the services rendered are of greater value than the benefits received. (*Sanguinetti* v. *Sanguinetti*, 9 Cal.2d 95 [69 P.2d 845, 111 A.L.R. 342]; *Lazzarevich* v. *Lazzarevich*, 88 Cal.App.2d 708 [200 P.2d 49], and cases cited; *Partrick* v. *Partrick*, 112 Cal.App.2d 107 [245 P.2d 704].) The court was justified in finding that no sufficient proof had been presented in this respect upon which to predicate any specific judgment, particularly where there was

a finding supported by the evidence that plaintiff knew of the illegality of the marriage from its inception.

The finding that it was first necessary to file a claim for such services in the estate under section 716 of the Probate Code before any action could be commenced thereon is supported by the cases of *Zaring* v. *Brown,* 41 Cal.App.2d 227 [106 P.2d 224]; *Etchas* v. *Orena,* 127 Cal. 588 [60 P. 45]; *See* v. *Joughin,* 18 Cal.App.2d 414 [64 P.2d 149]; and *Reed* v. *Reed,* 178 Cal. 187 [172 P. 600].

The court's ultimate finding that plaintiff is not entitled to recover from defendant on any cause of action alleged is supported by the evidence.

Judgment affirmed.

Barnard, P. J., and Mussell, J., concurred.