[Civ. No. 28842. Second Dist., Div. Two. Jan. 25, 1968.]

WESTERN AIR LINES, INC., Plaintiff and Respondent, v. JERALD S. SCHUTZBANK, as Commissioner of Corporations, etc., Defendant and Appellant.

*Assigned by the Chairman of the Judicial Council.

Thomas C. Lynch, Attorney General, Herbert E. Wenig, Assistant Attorney General, and Richard W. Jennings for Defendant and Appellant.

O'Melveny & Myers, Pierce Works, Darling, Shattuck, Hall & Call, Hugh W. Darling and Donald K. Hall for Plaintiff and Respondent.

ROTH, P. J.—The subject matter of this appeal was before this court in *Western Airlines, Inc.* v. *Sobieski,* (hearing denied) 191 Cal.App.2d 399 [12 Cal.Rptr. 719] (*Sobieski*) and the detailed factual statement therein made is pertinent here in all respects. Additional facts will be recited as the context may require.

Western Airlines, Inc. (Western), having determined to amend its certificate of incorporation (Certificate) to eliminate therefrom the provision for cumulative voting, commenced to gather proxies to effect that objective without obtaining a negotiating permit from the Commissioner of Corporations (Commissioner). After a large number of proxies

had been obtained, without a permit so to do, Western was told by Commissioner that a negotiation for a deletion of the cumulative voting right was a sale or exchange of securities (Corp. Code, §§ 25500, 25009, subd. (a), 25507 and 25510)[1] and that the exchange would be voided under section 26100 unless a negotiating permit were issued. Western, on August 31, 1956, then applied for and obtained a negotiating permit. On October 15, 1956, Western applied for a permit to amend its Certificate. In each application, i.e., the application for a negotiating permit and the one to amend its Certificate, Western contended that Commissioner did not have jurisdiction and it specifically reserved this question.

A four-day hearing on the application to amend the Certificate pursuant to section 25510 was had beginning November 13, 1956.

Concurrently with the foregoing hearing, there was also heard the separate application of Western theretofore filed on November 8, 1956, to amend a permit previously granted to Western to issue convertible debentures wherein Western sought to eliminate the cumulative voting rights from stock it could be caused to issue in exchange for such debentures. The Commissioner denied the application to amend the Certificate and the application to amend the permit in respect of the debentures. The joint order of denial was made on February 8, 1957.

Western thereupon, on February 28, 1957, pursuant to sections 25317, 25318 and sections 1085-1094.5 of the Code of Civil Procedure, filed a mandate action in the superior court to compel the Commissioner to vacate his order (original mandate action). Pursuant to the stipulation of the parties in the original mandate action, the superior court entered a judgment on April 12, 1957, vacating the Commissioner's order theretofore made on February 8, 1957, and the case was remanded to the Commissioner for reconsideration in the light of the existing administrative record and for the reception of such other pertinent evidence as the parties and the holders of securities of plaintiff might offer.

After said stipulated judgment, a second hearing before the Commissioner was commenced on June 13, 1957.

The administrative record of the first hearing remained intact in all respects, except that the findings and conclusions

---

[1]All references herein are to the Corporations Code, unless otherwise noted.

made at the first hearing were stricken pursuant to motion of Western. Six intermittent days were consumed in the second hearing for additional testimony and argument, and the case was submitted for decision. The Commissioner, on February 5, 1958 (February order) on the ground that it would be against public policy in California to find that the deprivation of the right to cumulative votes would be fair and equitable, again denied both applications. (§§ 25500, 25510, 25507.) Western applied to the Commissioner for a rehearing. This request was denied.

Western then, on February 28, 1958, commenced a second action in mandate in the superior court requesting administrative review or in the alternative that the administrative proceedings be dismissed for lack of jurisdiction. The second mandate action was by stipulation heard upon the briefs of counsel and the administrative record of the proceedings had before the Commissioner, comprising several volumes of transcribed testimony and scores of exhibits. There was no additional evidence before the superior court.

In the second mandate action resulting in *Sobieski*, trial was limited to the *single issue* of the Commissioner's jurisdiction. The trial court held as a matter of law that the Commissioner had proceeded without or in excess of jurisdiction and vacated the February order. An appeal was taken from that judgment and this court reversed it. (*Western Airlines, Inc.* v. *Sobieski, supra.*)

In *Sobieski*, we *finally* settled certain facts and some propositions of law. We remanded the case, however, to the superior court for resolution of an undetermined issue, saying on page 414:

"This, however, raises another disagreement between the parties. . . . Western . . . argues that since the trial court never appraised the commissioner's findings *from either the standpoint of substantial evidence or, as it contends should have been done, an independent review of the evidence,* the matter must be remanded to the superior court for trial. Western's position in this regard appears to be correct. . . . The court below determined there was no jurisdiction, and thus made no determination of the merits of the case, *that is, whether there was substantial evidence to support the commissioner's findings.* (See *Martin* v. *Alcoholic Beverage etc. Appeals Board,* 52 Cal.2d 259, 264-265 [341 P.2d 291].)" (Italics added.) (*Western Airlines, Inc.* v. *Sobieski,* pp. 414, 415.)

On the *Sobieski* remand, the trial court had before it the entire record so that it might determine therefrom whether there was substantial evidence to support the Commissioner's findings.

In connection with the immediately preceding excerpt from *Sobieski,* Western insisted that the trial court must determine not only whether there was substantial evidence to support the findings, but also whether the February order is supported by the entire record. Western's position in regard to its insistence on this point will sometimes be referred to herein as the twin issue. The trial court accepted Western's interpretation of the excerpt, tried the twin issue, and found against the Commissioner on each portion thereof.

There is considerable doubt as to the solidity of the trial court's position on the subject of the twin issue, although we accept it. In our view, *Sobieski,* as fortified by the denial of the petition for hearing, which directly raised the issue that the record does not support the February order, directed a remand as the clear language of the excerpt indicates, on the single issue of whether the findings of the Commissioner were supported by substantial evidence.

Western, in addition, at the *Sobieski* remand, introduced a new issue, not raised or squinted at in *Sobieski* and concededly unresolved by *Sobieski,* to wit: that Western did not receive a fair hearing by the Commissioner.

At the remand trial, no new evidence was taken. The record before the superior court on remand was the administrative record identical in all respects to the one theretofore before it. There were, of course, new briefs of counsel and the *Sobieski* opinion.[2]

*Sobieski* makes clear and settles, among other things, certain facts and principles, as follows:

1. The public policy of this state by statute compels a provision for cumulative voting in California corporations. Although it is not compelled for foreign corporations "the

[2]The judgment from which the appeal is taken recites: "[S]aid cause has been duly briefed and argued by the parties and the cause duly submitted on the administrative record of the proceedings heretofore had before the Commissioner and the evidence, both oral and documentary, heretofore adduced before the Commissioner at hearings held by said Commissioner on November 13, 15, 19 and 23, 1956 (hereinafter sometimes collectively referred to as 'the 1956 hearing') and on June 13, 14, 18, 19, 20 and 27, 1957 (hereinafter sometimes collectively referred to the 'the 1957 hearing') which said administrative record and evidence have been examined and reviewed by the Court. . . ."

commissioner may well, in his discretion, look askance upon any corporate scheme of voting which does not contain such rights.''

2. ''[A] Class of corporations . . . has . . . existed for many years [in this state] with technical domicile outside but which exercises most of its corporate vitality within this state.''

3. The Commissioner does not act arbitrarily and has the undoubted right in respect of corporations referred to in 2. above to classify certain corporations as ''pseudo-foreign.'' The inclusion of Western as pseudo-foreign was proper. We said: ''The argument that the commissioner has created another class of corporation is not persuasive, nor is the argument that legislative history relative to foreign corporations indicates that the Legislature, by eliminating earlier provisions requiring cumulative voting to be provided by all corporations and associations doing business in this state, declared an affirmative public policy allowing foreign corporations to provide whatever form of voting they wished persuasive.''

4. Cumulative voting is a substantial right and the policy of the Commissioner that the omission of such right in the Certificate of a pseudo-foreign corporation doing business in this state ''. . . will be considered by him as a negative factor . . . , is not [an] abuse of his discretion.'' We said in *Sobieski*, at pp. 413, 414: ''When we consider the complexity of present-day corporate structure and operation, and the far-flung area of corporate activities where transportation or nation-wide distribution of products may be involved, we are persuaded that the commissioner has this discretion. To hold otherwise, and to follow the argument of Western to its conclusion, would be to say that the commissioner might have the power in the first instance to require certain rights to be guaranteed to shareholders before he would permit the sale or issuance of a foreign corporation's stock in this state, but that immediately thereafter, by the device of amending the charter of such corporation in another state, the entire structure of that corporation, even to substantial changes in the rights of shareholders in California, might be legally effected. *Such a holding would enable a foreign corporation to destroy the rights which the State of California has deemed worthy of protection by the enactment of the Corporate Securities Act.* . . . Also, a fair and impartial reading of the pertinent Corporations Code sections convinces us that the amendment here

sought is a 'change in the rights, preferences, privileges, or restrictions on outstanding securities' (Corp. Code, § 25009, subd. (a), *supra*) of such nature as to be within the contemplation of the Legislature upon enactment of those sections.

''It would seem too evident to require protracted dissertation that the right of cumulative voting is a substantial right, and one which the Legislature may well have had in mind when it enacted the code sections here under consideration.'' (Italics added.)

Western's strictly legal position at the two hearings before the Commissioner and in *Sobieski*, may be summarized as follows:

Western contended that the Commissioner lacked jurisdiction because as a matter of contract under Delaware law as between itself and its shareholders it had a complete right to conduct its internal affairs, and, among other things, to amend its Certificate and that a deprivation of such an inherent contractual right on the theory of police power violates the obligation of contract, fails to accord full faith and credit to the act of a sister state and violates the due process clause of the Fourteenth Amendment of the United States Constitution. Straight voting, it asserts, is not an evil and there is no question of fairness or unfairness involved. The question is solely one of Delaware law; the proposed change affects all shareholders alike, and all of them, when they originally acquired shares agreed contractually that such a change might be made by a vote of the majority.

We consider that *Sobieski* settles the question of jurisdiction and obligation of contract as the law of the case.[3] It also settles that the Commissioner, when facts and circumstances warrant, may classify certain corporations as pseudo-foreign; Western is a pseudo-foreign corporation; cumulative voting is a substantial right; Western, as a pseudo-foreign corporation must make an application to the Commissioner to amend its Certificate, and that the Commissioner, within the exercise of a proper discretion, may determine whether such application should be granted or denied. (§ 25510.)

We consider, too, that the law of the case endorses the

---

[3]Western states in its brief that its right to amend its Certificate is a contractual right, guaranteed by the United States Constitution and that it has from the beginning preserved this right and intends, if necessary, to obtain a ruling on this question in the United States Supreme Court. *Sobieski* settles that contention for the purposes of this court, and we do not discuss it further.

statutory standard on which such discretion, denying or granting the application, must be based, to wit: the order must be fair, just and equitable to all the stockholders of Western. (§ 25510).

Western's affirmative position before the Commissioner on the facts was grounded entirely on its showing that an overwhelming majority of its directors was in favor of straight voting and that in an election to substitute straight voting for cumulative voting, regularly called and held, with all facts and arguments set before the shareholders, a majority of the shareholders voted for it.[4] This argument is fortified by an attempted showing that prior to his action on Western's application, the administrative record of the Commissioner indicated that he had granted permits to foreign corporations under circumstances substantially similar to those disclosed in Western's application, and that the Commissioner was bound by his administrative record.

Upon conclusion of the trial of the *Sobieski* remand, the superior court made detailed findings and conclusions and entered judgment directing the Commissioner to grant "*nunc pro tunc* as of February 5, 1958" the several applications of Western.

This appeal, number 28842, is by the Commissioner from that judgment.

The trial court's judgment is predicated on its conclusion that the Commissioner did not give Western a fair trial. This judgment is based on the trial court's findings that the Commissioner (1) prejudged the case, arbitrarily decided it on his own predilections, and not the evidence; (2) misled Western as to the issues; (3) misled this appellate court when it wrote *Sobieski* by making an allegedly erroneous finding, and (4) the Commissioner did not adhere to his administrative record.

A finding of an unfair trial, supported by substantial evidence, is, of course, sufficient to support the trial court's judgment. The authorities hold that if Western was deprived of a fair trial at the administrative level, this is a question of fact to be determined upon a nisi prius basis by an independent weighing of the evidence by the trial court. (§ 1094.5 subd. (b). Code of Civil Procedure, and the rules set forth in *King* v. *Board of Medical Examiners*, 65 Cal.App.2d 644, 653 [151

---

[4]There is considerable doubt as to whether Western did have a valid majority. This point is treated *infra.*

P.2d 282], and *National Labor Relations Board* v. *Phelps* (5th Cir. 1943) 136 F.2d 562; *Inland Steel Co.* v. *National Labor Relations Board* (7th Cir. 1940) 109 F.2d 9, 20.)

The trial court found that the hearings before the Commissioner were unfair.

In addition, the judgment is further fortified by a finding in favor of respondent on the twin issue referred to:

1) The material findings upon which the February order was based were not supported by substantial evidence, and

2) That the February order is not supported by the weight of the evidence in the light of the whole record.

The Commissioner contends that both hearings which culminated in the February order, were fair in all respects, that his findings are supported by abundant evidence and that the record demonstrates that the weight of the evidence shows that the February order is fair, just and equitable. He asserts that the trial court by its judgment exceeded its jurisdiction, usurped the authority conferred upon the Commissioner by the Legislature and substituted its judgment for that of the Commissioner. We agree.

It should be noted at this point that aside from the complaints against the Commissioner which we treat in some detail *infra*, the only showing affirmatively disclosed by the record made by Western in support of its application to amend its Certificate, is that since there is nothing inherently evil in cumulative voting, and since in excess of 51 percent of the shareholders consented to substitute straight voting for cumulative voting, and since much of the business affairs of Western are conducted outside of the State, that even though originally a California corporation, it has been for many years a foreign corporation, and should be so treated. Succinctly stating Western's position, one of its counsel, at the first hearing, said:

"It is only when the enterprise is entirely within California that California has been presumed to take jurisdiction of the internal affairs of a foreign corporation."

If *Sobieski* had held that pseudo-foreign corporations must provide for cumulative voting, it would have resolved all issues now raised. As previously pointed out, however, *Sobieski* did say (page 413): "It is certainly equally likely that the Legislature, by eliminating and failing later to reenact the sections requiring foreign corporations to provide for cumulative voting, *intended to allow the appraisal of the fairness of the corporate structures of foreign corporations to be examined and appraised by the commissioner within reasonable*

*limits of discretion,* as it is that such legislative action was a declaration of public policy. It seems patent that if the Legislature may provide that all domestic corporations shall have cumulative voting, *the commissioner may well, in his discretion, look askance upon any corporate scheme of voting which does not contain such rights.* This is not to say that under certain circumstances the commissioner, in the exercise of sound discretion, could not approve the issuance of securities in a corporation which did not provide for such cumulative voting." (Italics added.)

Since, therefore, there was a discretion vested in the Commissioner in respect of pseudo-foreign corporations, Western was certainly entitled to a fair hearing.

## UNFAIR TRIAL.

 We treat first the issue of unfair trial. There is no claim by Western that it was not fully heard and with one exception, subsequently cured,[5] there is no complaint that any of the evidence it offered was improperly rejected. There is no suggestion, even remote, of any high-handed or arbitrary conduct of the proceedings or a lack of courtesy or patience on the part of the two separate hearing officers or of their conduct at each hearing.

## BIAS OF THE COMMISSIONER.

In *Phelps, supra,* one of the authorities cited by Western in support of its position, the hearing officer not only made remarks showing clear bias during the hearing, but he assumed an active role in the proceedings and conducted himself as prosecutor to prove the charges made. It was in no sense an impartial administrative proceeding. There is no evidence in the record before us of similar conduct on the part of either hearing officer.[6] There is no evidence, nor does Western attempt to

---

[5]The Commissioner, at the second hearing, had rejected 11 files offered by Western. Western and "[T]he Attorney General as counsel for the Commissioner stipulated that without admitting their materiality or other evidentiary value the files of the eleven (11) companies . . . could be treated as having been introduced by plaintiff and received into evidence at the hearing before the Commissioner, . . . . This statement is made pursuant to that stipulation and for the purpose of demonstrating that (1) the differentiating factors pertaining to the instant permit application and (2) the cases of the eleven (11) companies do not establish any past administrative interpretation by the Commissioner that with foreign corporations having a factual situation similar to Western straight voting was approved through the issuance of a permit or that the type of voting for directors was not to be considered in passing upon the fairness of a particular issuance or exchange by a particular corporation."

[6]There were two hearings of the matter at bench, each conducted by a different hearing officer.

argue that there is, of any similarity in the proceedings in *Phelps* and those which took place before the Commissioner. In fact, at the end of the first hearing, one of the counsel for Western said:

"Mr. Examiner, I want to express my gratitude for the very fair manner in which this hearing has been conducted, and for the studious attention you have given to the witnesses. Thank you very much."

At the end of the second hearing Western's counsel made a similar statement.

The personal equation of bias and prejudice on the part of the hearing officer present in *Phelps* was entirely absent at bench. In fact, the claim of unfair trial insofar as it even squinted at personal bias and prejudice, is limited to a showing that deputies Green and Fields and Assistant Commissioner Smith had, in 1956 and 1957, indicated to applicants generally the attitude of the Commissioner in respect of applications of foreign corporations involving the right of cumulative voting.

Typically reflecting this attitude, a letter from Smith, dated September 12, 1956, to an applicant other than Western, declared the attitude of the Commissioner to be: "[W]e do not look with favor upon the elimination of a right of accumulative [*sic*] voting . . . which is domiciled in, or has sold a majority of its securities in . . . California . . . [T]he legislature has provided that shareholders must have [such] . . . voting rights, . . . [i]f a foreign corporation domiciled outside . . . California . . . , desires to offer a small portion of its shares to residents of California, we do not ordinarily *insist* upon such shares having [such] rights."

Western calls our attention to Smith's testimony in part, as follows:

"Q. If the Legislature were to limit section 2235, or repeal it, with the result that straight voting were permissible in California, would you then feel that straight voting was unfair? A. *I personally would, yes, under all of the circumstances that we have talked about.* Q. And in such case, even though the Legislature permitted straight voting, you would decline to issue a permit calling for straight voting in the case of a corporation having its principal place of business in California and selling to California investors? A. Well, that is a hypothetical case. Q. Certainly it is. A. I believe that if the right of cumulative voting would grant to shareholders of a minority interest the right to be represented on the Board of

Directors, that such right is of benefit to such minority share-holders and the deprivation of that right is a detriment to those shareholders, and under such circumstances, *I believe that I would be unable to find that the substitution of securities depriving the shareholder of the right of cumulative voting would be fair.* Q. Even in the case where the Legislature said to the corporation, 'You may adopt either method'? A. Yes. . . ." (Italics added.)

In our opinion, nothing in the foregoing shows bias. The letter dated September 12, 1956, and the brief excerpt of the Smith testimony, is no more than Smith's forthright declaration to the effect that he believes in cumulative voting, that it is a substantial right, and that he ". . . would be unable to find that the substitution of securities depriving the share-holders of the right . . . would be fair" is saying no more than has been said by the Legislature and which we say in *Sobieski.*

However, it should be noted further that Smith was called by Western as its witness at the second hearing, and that a reading of all of Smith's testimony demonstrates that Smith's attitude toward the right of California shareholders to cumulative voting in a pseudo-foreign corporation, was substantially in accord with the expression of this court in *Sobieski.* Nothing in the record indicates that Smith's opinion in respect of voting rights affected the hearing officer or the Commissioner any more than the numerous opinions given by directors and shareholders called by Western who testified to the advantages and efficiency of straight voting. His testimony is nothing more than part of an avalanche of testimony on the merits of straight voting as against cumulative voting introduced at the hearing.

However, assuming *arguendo* that Smith was speaking for the hearing officer and the Commissioner, this evidence supplied as a predicate for bias and prejudice, shows to the contrary a completely proper desire to affect the legislative policy of the state and enforce the law of the state.

The evidence of Smith shows that if he were the hearing officer, or the Commissioner—or both, and a pseudo-foreign corporation applied for the type of permit herein questioned, it would be granted, if there was an affirmative showing that it was fair, just and equitable to the stockholders. In fact, Smith's testimony, when read in its entirety and the September letter, leave no doubt, that on a proper showing the Commissioner would grant the type of permit which Western

was seeking. Further, Western's effort to prove bias by introducing files showing that the Commissioner, over a period of years, had granted permits to foreign corporations, treated in more detail *infra*, shows that the Commissioner did not have a bias, and that in proper cases such permits were granted.

The fact that a hearing officer or a judge believes or does not believe in the law which must be applied to evidence before him, does not disqualify him or make him biased or prejudiced.[7]

In *Weil* v. *Weil* (1951) 37 Cal.2d 770 [236 P.2d 159] an action for divorce, the trial judge told the defendant that he was disposed to grant her a divorce and alimony for a short period but that he didn't believe in separate maintenance for short marriages. Addressing itself to the declared attitude of the judge, our Supreme Court stated at page 776: "The judge's statement that he did not believe in separate maintenance for short marriages does not, in our opinion, evidence an unwillingness to try defendant's case according to law. A judge is not required to approve every statute or precedent by which his decision is governed. Like other citizens he is bound, not to believe in a particular law, but to obey it. Thus, he may doubt the wisdom of particular economic legislation, but it is nevertheless his duty to enforce it in a proper case. A judge who disagrees with the policy of a statute is not necessarily disqualified from hearing a case in which that statute must be applied. In the present case, there has been no showing that the judge's opposition to separate maintenance for short marriages was anything more than a personal opinion concerning

---

[7]Corpus Juris Secundum substantiates this position. Vol. 48 at pp. 1059-1060: "It is generally considered that the only prejudice which will disqualify a judge is a personal prejudice for or against a party to the cause . . . . An impersonal prejudice resulting from a judge's background, associations or experience, or his prejudice against the cause or defense of a party or against a particular type of litigation ordinarily is not enough. However, it has also been held that a judge is disqualified to preside in a case where his relation to the subject matter of the action is such that a natural inclination to prejudge the case would arise therefrom." [Citing a single Ohio case for this last statement. This statement would seem to be outweighed by the language of *Weil* v. *Weil*, 37 Cal.2d 770 [236 P.2d 159].]

Page 1061: "He is not disqualified because he has formed an opinion as to the legal questions involved in the case . . . ."

Page 1062: "A judge is not disqualified for bias and prejudice merely because he had been a member of the legislature which enacted a statute involved in the case, or advocated the passage of the particular statute involved, or counseled with others as to the best means of enforcing it . . . ."

the wisdom of the legislation involved. The judge was guilty of no misconduct in thus expressing to the parties what he believed the law should be. The Legislature itself has not infrequently heeded judicial comment suggesting modification of statutes." (*Weil* v. *Weil, supra.*) At bench, contrary to *Weil*, the evidence is unequivocal that Smith did believe the policy of the law. There is no evidence that he or the Commissioner would not obey it.

 It is clear from the foregoing that there was no personal bias or prejudicial predilection on the part of the commissioner in the sense pointed out by *Phelps* and the other authorities cited by respondent or otherwise.

Respondent, however, asserts unfairness in three other respects:

(2) The Commissioner at the second hearing concealed issues upon which findings were to be made, and as a consequence Western was misled to its prejudice.

(3) Two of the findings of the Commissioner, to wit: IV and V misled the *Sobieski* court.

(4) The Commissioner departed from an established administrative record in respect of foreign corporations.

 (2) Western bottoms its charge that it was misled as to the issues to be tried at the second hearing entirely upon the Mattes letter.[8] Western asserts the letter limited the issues upon which findings were to be made, and in addition, Western affirmed and aggressively contended that the only real issue was whether the "terms and conditions" of the pro-

---

[8] "Enclosed is a copy of Order Restoring Application for Consideration and copy of Notice of Hearing in the above entitled letter. The Order and Notice have been sent to Darling, Shattuck and Edmonds, Attorneys at Law of Los Angeles, with request for mailing to security holders and publication. To enable you to prepare for presentation of evidence and points of authorities at the time of hearing, we wish to notify you that the Commissioner has been advised by the Attorney General that the issues which were raised at the first hearing and upon which the Commissioner will make findings and determinations are as follows:

A. Whether the purported amendment to eliminate cumulative voting is valid and effective because:

1. The holders of convertible debentures were not given notice thereof.
2. Neither a majority nor two-thirds of the holders of convertible debentures did not approve the amendment as required.
3. Whether the adjournment from September 12 to October 10, 1956 without issuance of a new notice to shareholders complied with the notice requirements of the statutes, by-laws and certificate of incorporation.
4. Whether adjournment for 28 days without changing the closing record date (July 25, 1956) for voting of shareholders violated

posed change from cumulative to straight voting was fair and equitable to all corporate security holders, as a class, and that the Commissioner did not confine his findings to that issue.

Mattes was a deputy commissioner who represented the

Article XV of the By-Laws limiting the closing date to 40 days prior to the meeting.
5. Whether the orange proxies which were solicited on July 31, 1956 and secured prior to issuance of the negotiation permit on August 31, 1956 were void.
6. How many orange and how many buff proxies were voted in favor of the amendment on October 10, 1956, i.e., was there a majority of shares voted by valid proxies?
7. What was the effect of the refusal of the Chairman of the stockholders' meeting to permit the duly appointed 'observer' of the tallying of the vote (Bartman), to voice his objection to the validity of the proxies and the announced vote?

B. Whether the proposed exchange of shares resulting from the elimination of cumulative voting by this corporation would be unfair per se to the security holders under California law, where its shareholders reside in California, its principal place of business and major portion of its property is in California, whose intra-state business in California is subject to regulation by the Public Utilities Commissioner of California.

C. Whether the proposed exchange of shares resulting from the elimination of cumulative voting would be unfair to the security holders in this particular case because of the following facts and circumstances:
1. The alleged purpose of Mr. Bartman and his associates to merge Western with some other airline, or have some other line buy all its assets.
2. The point raised by shareholder Moll (Exhibit 13) that Western is a public utility subject to the jurisdiction of the Utility Commission of California, and hence in a position different from that of an ordinary foreign corporation.
3. The point raised by shareholder Barttro (Dept. Exhibit A) that in his opinion management is taking too much from Western in form of retirement pensions and profits on the sale of stock options. In this connection, have any officers or employees sold stock which they acquired under the 'Management Stock Purchase Plan.' If so, when, in what amounts and at what profit? A tabulation showing all remuneration and benefits received by the officers and directors, directly or indirectly from salary, director's fees, stock options, bonus, retirement, and otherwise during the past three years should be made available.

 Also in this connection, to what extent, if any, have directors or officers dealt with the corporation and has there been compliance with the Tenth article of the Certificate of Incorporation, Information with relation to the benefits, if any, derived by such officers and directors during the past five years either directly or indirectly by reason of any business they or their firms have had with the applicant should be made available, including such benefits as attorney's fees, insurance or broker's commissions on loans or similar transactions. If such benefits were derived, was it disclosed to the corporation and approved?
4. A complete copy of the Minutes of the meetings of the shareholders, the Board of Directors, and the Executive Committee of the Board of Directors, for the past three years should be made available for introduction into evidence.''

234

Commissioner before each of the hearing officers who were also deputy commissioners.

Participation in the hearing, however, was not confined to the Commissioner and Western. Before each hearing, notice as required by law, setting forth in general language the issues,[9] was sent to the shareholders. A number appeared in person. One group of objectors appeared herein referred to as the

[9]The notice of the second hearing, substantially in full, was as follows:

"You are hereby notified that on Thursday, the 13th day of June, 1957, at the hour of 10:00 A.M. of that day, a public hearing will be held before W. H. Stephenson, Commissioner of Corporations of the State of California, or an assistant or deputy of the said Commissioner of Corporations, at Room 800 Mirror Building, 145 South Spring Street, Los Angeles, California, on the application of the above named corporation for a permit authorizing it to issue in exchange for outstanding shares, shares subject to provisions of its certificate of incorporation, as amended, to delete from said certificate Article Fifteenth now therein contained providing for cumulative voting upon the election of directors.

"The certificate of incorporation as now in effect provides for cumulative voting at all elections of directors. This means that at all such elections each shareholder entitled to vote is entitled to as many votes as shall equal the number of his shares multiplied by the number of directors to be elected, and he may cast all of such votes for a single director, or he may distribute them among the number to be voted for, or for two or more of them as he may see fit. If the certificate of incorporation is amended as proposed each shareholder will be entitled to votes equal to the number of shares owned by him and the holders of a majority of the outstanding shares can elect a full slate of directors at the annual election.

"If you are interested in said matter and desire so to do, you may appear at said hearing in favor of or in opposition to the granting of such permit, or you may address a communication in writing to the Division of Corporations, 145 South Spring Street, Los Angeles, expressing your views.

"Said hearing will be predicated upon the record of the hearing heretofore held upon said application and such other pertinent evidence as the Commissioner of Corporations, the applicant, and the holders of securities of the applicant may offer. The hearing will be for the purpose of enabling the Commissioner to determine whether or not the proposed amendment to the Certificate of Incorporation of applicant is fair, just and equitable.

"In this connection the principal issues raised by the participants at the first hearing of this matter were:

"(a) Whether the purported amendment to eliminate cumulative voting is valid and effective.

"(b) Whether the proposed exchange of shares resulting from the elimination of cumulative voting by this corporation would be unfair per se to the security holders under California law, where a large part of its shareholders reside in California, its principal place of business and major portion of its property is in California, and its intra-state business in California is subject to regulation by the Public Utilities Commission of California.

"(c) Whether the proposed exchange of shares resulting from the elimination of cumulative voting would be unfair to the security holders in this particular case because of the surrounding facts and circumstances.

"Dated: Los Angeles, California
May 24, 1957"

Bartman Group. The Bartman Group represented by counsel at each hearing, was aggressive in its opposition from the beginning to the end of each hearing.

At this point it becomes pertinent to set forth generally that portion of the background herein referred to as admitted facts which propelled Western[10] to make its application to eliminate cumulative voting from its Certificate.

William S. Bartman and one Billard were elected to Western's board on or about April 19, 1956.

William S. Bartman and his family controlled some 11,436 of the applicant's 743,963 outstanding shares and $197,000 of its $5,000,000 of convertible debentures. Bartman had informed Western that he and other minority shareholders intended to cumulate votes to elect directors of their own choosing. Western refused Bartman access to the list of shareholders which he desired, for the purpose of soliciting proxies. Delaware and California law gave him this right and Western's refusal was in violation of section 8, article III of its bylaws. Bartman's action precipitated the following series of events:

On the morning of April 19, 1956, prior to the shareholders' meeting which had been called to elect a new board, the old board met and:

Eliminated section 8, Article III from the by-laws. This action evaded section 219 of Delaware law which required management to make available to a shareholder an alphabetical list of shareholders entitled to vote, showing names, addresses and shares held, at least 10 days before a shareholders' meeting for the election of directors.

Extended the employment contracts of President Drinkwater and Vice-President Shatto for a seven-year period.

At the annual meeting on April 19, 1956, Messrs. Bartman and Billard (the opposition candidates), were by cumulative voting, elected to the new board, despite denial of access to the shareholders' list. The new board then met and amended the by-laws to increase the number of directors from 13 to 15. The two defeated candidates were reappointed.

The new board, at the same meeting, authorized the president to appoint an Executive Committee of five directors to

---

[10]We say ''propelled Western'' because, although two of the directors testified that they had been thinking of the advantage of straight voting over cumulative voting, it is a fact that so far as the minutes disclosed, it was never discussed at a board meeting, before Bartman and one Billard were elected to the board.

exercise most of the powers of the board of directors. So far as appears from the record, this was the first time such a committee had been appointed.

On May 4, 1956, Bartman, now a director, requested the right to inspect the shareholders' list. This request was refused in violation of section 3004.

Shortly thereafter, Western embarked upon a program to eliminate cumulative voting:

(a) On July 12-13, 1956, the board resolved to eliminate cumulative voting by deleting Article Fifteenth from the Certificate of Incorporation.

(b) On July 18, 1956, Bartman again demanded the right to inspect the shareholders' list which he desired to enable him to solicit shareholders to join him in opposing the proposal to delete Article Fifteenth.

(c) Bartman obtained a writ of mandate from the superior court to vindicate this right.

(d) On July 31, 1956, Western, without having first secured a negotiating permit from the Corporations Commissioner, (it will be remembered Western obtained its permit to solicit proxies to amend on or about August 31, 1956) transmitted a proxy statement to all shareholders setting forth its proposal to eliminate cumulative voting, enclosing an orange (pink) proxy form against cumulative voting to each shareholder.

(e) The Securities and Exchange Commission directed Western to correct ''certain misleading impressions'' i.e.— that cumulative voting would enable a competitor to place a director on the board—in literature it had sent to shareholders. Western then mailed a statement correcting the ''misleading impression.''

(f) Western, on July 13, 1956, fixed the special shareholders' meeting to be held for the purpose of amending its Certificate for September 12, 1956. Bartman secured an injunction from the superior court to have the meeting continued to October 10, 1956, to permit sufficient time for his group to send out proxy statements and to obtain proxies favoring the preservation of cumulative voting.

(g) At the October 10, 1956, shareholders' meeting in Los Angeles, Western voted the orange (pink) proxies received prior to the issuance of the negotiating permit on August 31, 1956, and prior to making corrections required by the Securities and Exchange Commission, representing 194,278 shares.

Without these proxies the amendment would have been defeated.

There is, in addition, other factual background which is inescapable.

Both hearings before the Commissioner had, of necessity, to be bottomed upon Western's verified application to the Commissioner to effect the change. The application after setting forth the steps taken to hold an election and the results of the election sets up other pertinent facts.

Respondent summarizes some of these facts in its brief as follows:

"Western is a Delaware corporation; it is a federally certificated air carrier which does no business in Delaware but does a substantial amount of business and owns a substantial amount of property in (a) California on the one hand, and (b) the states, collectively, of Arizona, Colorado, Idaho, Minnesota, Montana, Nebraska, Nevada, Oregon, South Dakota, Utah, Washington and Wyoming (not to mention Canada and Mexico) on the other. Its capital stock is held in substantial amounts by (a) California residents, on the one hand, and (b) collectively, the residents of states other than California, on the other. Its main offices are located in Los Angeles."

Western's application sets out further pertinent facts as follows:

"Submission by Western to its shareholders of the proposal to amend . . . as recommended by all of the officers and by 13 of the 15 directors, was fair in all respects and was not misleading in any respect. The affirmative vote . . . of more than a majority of the outstanding shares . . . fairly reflects the true will of the majority and the proposed amendment is just and equitable and complies with all applicable laws."

To Western's application, Exhibits A to N, both inclusive are attached. Exhibits G, H, I and J, set out as part of the application, substantially all of the matters which we have referred to as admitted facts.

To the Commissioner, Western presented evidence as to the fairness of notice and all communications sent to shareholders prior to the election, the fairness of the election, and the result thereof, and produced many witnesses who testified to the advantages of straight voting vis-a-vis cumulative voting.

Western argues in respect of admitted facts that the treatment accorded the objectors, particularly the Bartman group,

as actually disclosed in its own application, was immaterial on the issue of whether the change to straight voting was fair, just and equitable to all shareholders as a class.

The Bartman group, of course, aggressively urged that the admitted facts were pertinent on that decisive issue. Mattes, as counsel for the Commissioner, argued very early in the first hearing upon objection by Western, that the so-called immaterial admitted facts were pertinent on the theory that it showed that Western's board had the attitude it "... need not consider wishes of the minority."

The first of many scrimmages on this type of evidence occurred early in the first hearing. The president of Western was being queried on the refusal of Western to permit an examination by an established shareholder and director of the shareholder's lists, books, accounts and records of Western. Counsel for Western did not object but said: "[M]y disinclination to object to this line of questioning does not mean that I believe them to be material but I just rather remain silent."

Shortly after the above statement by counsel, the president of Western testified:

"... Mr. Bartman didn't start a lawsuit for about a month after ... I don't *know but I assume those documents will be part of the record in these proceedings.*" (Italics added.)

Later in the hearing, again speaking in respect of the admitted facts, counsel for Western said:

"... I have no objection to this going in, but it is opening a gate that is likely to produce a steady flow ... then I will have to produce evidence ...."[11]

Further in the proceedings, there was an offer by counsel for the objectors. The offer comprised all the letters exchanged between the Bartman group and Western on the subject of the inequitable treatment of the Bartman group, the offer was objected to and objection was then withdrawn by Western "... on condition the answered letters will be received likewise ...", to which objectors' counsel represented "I have no objection to the answering letters when they are introduced."

The minutes of Western which corroborate and fortify the

---

[11]His assumption was correct. The judgment of mandate and injunction and the complaint on which they were based, were made a part of the record and were referred to in Western's application. All of the pertinent minutes of Western which show the admitted facts, were also made a part of the record.

inequitable conduct complained of are referred to in paragraph 4 of the Mattes letter.

Our narrative of the admitted facts to which Western objected as immaterial, makes clear that these admitted facts had been made a part of the record, not only by testimony and exhibits, but in large part by the verified application upon the basis of which Western sought its permit.

Western asserts in its brief ". . . the Mattes letter clearly informed Western and its counsel, for their guidance at the 1957 hearing, that 'inequitable conduct', among other things, had not been in issue at the 1956 hearing and would not be the subject of findings and determination.''

The trial court accepted this argument and its Finding 13 in support of the judgment eliminates all of the Commissioner's findings on this subject.

"13. The following findings of the Commissioner rendered by him after the 1957 hearings were outside of the issues specified in the Mattes letter: IV, V, XIII, XV, XVI, XVII, XVIII, XIX, XXI, XXII, XXIII, XXIV, XVI, XXVIII, XXIX, XXXIV, XXXV, XXXVII, and XXXIX.''

If there were nothing before this court other than the stipulated judgment mentioned at the outset, requiring the second hearing and the record thereof; the record of the first hearing; the Commissioner's notice (fn. 9) and the Mattes letter (fn. 8), it would be difficult for this court to understand how Western could possibly have been misled.

However, there was much more which Western could not possibly have ignored.

a. The facts called to the Commissioner's attention on its own verified application. If they were immaterial, why the elaboration with detailed exhibits? If Western considered these facts material to show all the circumstances surrounding the election and to prove its fairness and how well the shareholders were informed, then they were facts Western desired the Commissioner to consider.

b. Western's counsel did not accept the issues as defined in the Mattes letter. By prompt reply Mattes was told in effect that he could not define the issues for Western.

c. The correspondence between Mattes and Western's counsel did not include the objectors, particularly the Bartman group, and could not bind the objectors, even if it had been crystal clear between Western and the Commissioner that the so-called immaterial issues were to be eliminated. The objec-

tors had an undoubted right to be represented and to participate in the proceedings. (§ 25510.)

It is abundantly clear from the record at both hearings and from the opinion in *Sobieski, supra,* that a group of shareholders holding enough shares to elect and who actually did elect two directors were vitally interested in preserving the right to cumulative voting and aggressively participated with counsel in both 1956 and 1957 hearings. Counsel for the objectors completely independent of Mattes, made it clear in both hearings that the minority group he represented predicated their opposition to the elimination of cumulative voting, substantially on a series of misfeasances of the management of Western and were making this series of misfeasances issues in both hearings. It is also abundantly clear from the record that Western participated in the trial of these very issues as to which it claims it was misled by the Mattes letter.

The record demonstrates that the opposing shareholders did not regard the Mattes letter as having eliminated the issue of inequitable conduct and that the minutes required by paragraph 4 of the Mattes letter were produced because of the repeated and aggressive demands of the opposing group. It is also clear that counsel for Western knew that the opposing group was pressing the issue of inequitable conduct and at the 1957 hearing requested the minutes of Western to augment the record of the 1956 hearing and to fortify the showing of Western's inequitable conduct.

d. As pointed out, the stipulated judgment recognized that all of the evidence of the first hearing was to be part of the second. This was not only recognized by Western, but it was implicitly ratified when Western's counsel before the commencement of the second hearing before the Commissioner moved that the findings theretofore made which led to the first order, be set aside.

Further, at the outset of the second hearing, and throughout the holding thereof, it was made clear by the objectors that the misfeasances of management as reflected in the admitted facts were very much in issue. Excerpts could be multiplied, but one will suffice. Early in the second hearing, the objectors commenced to introduce evidence of Western's inequitable conduct. An objection was made and it is most revealing.

''Mr. Works: I am going to object to that question on the

ground *this subject was fully and adequately covered at the time of the hearing held last year.* [Italics added.]

"MR. RHODES: I believe not, Mr. Works. I was personally present, and I assure you I would not be repetitive if I had any recollection the question was asked here before. MR. WORKS: On the further ground it is immaterial. HEARING OFFICER: Objection overruled. Proceed."

It would seem reasonable to assume that if Western were relying upon the limited issues which it construed the Mattes letter to set forth, an objection would not only have been made on the ground that the issues had been so limited but there would have been an aggressive attempt *at that point* to remind the hearing officer that he had limited the issues and promised in effect via the Mattes letter to make no findings on so-called immaterial matters, and that in the circumstances, it was a waste of time to receive evidence on such immaterial matters.

We have noted that Western does not say that it was unaware or misled in respect of the "presentation of evidence . . . ." Western limits its position to the point that *no Findings would be made* on what it argued was immaterial evidence. The distinction to us is one without a difference.

e. The recital in the judgment before us specifically includes the 1956 and 1957 hearings as the record upon which it is based.[12]

There is no substantial evidence to support the trial court's findings.

It is clear to us beyond a reasonable doubt Western was not misled in respect of any issue or facet of this litigation from its inception to its current status.

■ (3) Western contends further that the trial was unfair in that two of the Commissioner's findings, to wit: 4 and 5, misled this appellate court in *Sobieski.* In pertinent part, the findings in question are as follows:

"[P]rior to December, 1924, Western Air Express, Inc., . . . organized . . . under the laws of California. Section 12, Article XII of the California Constitution in effect since 1879, and Civil Code, Section 307 mandatorily required that Western. . . , guarantee and it did guarantee, . . . the right of

---

[12]". . . [S]aid cause has been duly briefed . . . and . . . submitted on the administrative record of the proceedings heretofore . . . before the Commissioner and . . . evidence, . . . adduced before the Commissioner at hearings . . . on November 13, . . . ('the 1956 hearing') and on June 13, . . . ('the 1957 hearing') which said administrative record and evidence have been examined and reviewed by the Court; . . ."

cumulative voting. . . . This requirement is now contained in Corporations Code Section 2235. . . .''

Finding 5 ''. . . the shareholders of Western . . . acquired their shares in reliance upon the aforesaid guarantee. . . .

'' [A]pplicant was organized on October 1, 1928, under the laws of the State of Delaware . . . and under permit granted by the Commissioner of Corporations, . . . on January 5, 1929, issued its shares to the shareholders . . . in consideration of the transfer to applicant of the shares of said California corporation.

'' [I]n connection with the application . . . applicant herein, represented to the Commissioner that the shareholders of the California corporation would not be hurt in any way by the granting of the permit.''

Before exploring the alleged bias and unfairness charged to this finding, we hasten to say that if any criticism of the findings excerpted is sound, and we don't think it is, the most that can be said in justification of such criticism, is that it may be immaterially erroneous, and we don't think it is that either.

In 1928, when Western, then a California corporation, changed its corporate structure to make the shareholders of the California corporation shareholders of the Delaware corporation, as the findings indicate, an application was made to the Commissioner by the Delaware corporation to permit the shareholders of the California corporation to make the exchange.

In its application, then made, Western represented and stated that the rights of cumulative voting would be preserved. The permit was granted and the right was preserved from that date until Western sought to change it by its application, now at bench.

During the course of the 1929 hearing, the transcript of which we have examined, Mr. Tuller, then appearing as counsel for Western, answered an objection of a dissenting shareholder at the hearing before the Commissioner, and at that time stated in substance that ''The shareholders of the California corporation would not be hurt in any way. . . .'' The objection was made not specifically as to cumulative voting and the answer of Mr. Tuller stated generally as above, was not made in the specific context of cumulative voting.

Western now argues that Western did not, nor did Mr. Tuller who answered the objector at the 1929 hearing, guarantee its shareholders cumulative voting in perpetuity. Western

points out that the Certificate of the Delaware corporation which took over in 1929, provides that it may be amended, and that any application that it made, and any permit granted thereto, had to be made with the provisions of its Certificate in mind.

The colloquy between Mr. Tuller and the objector in 1929 may be considered a non sequitur, particularly as Western contends, and we accept its contention, that it has no specific relation to the subject of voting.

There is, however, no question but that Western in its 1929 application said that cumulative voting would be preserved. Relying solely on that statement in Western's then verified application, the Commissioner could find that it is guaranteed.

The Commissioner does not find that it is guaranteed in perpetuity. Reading the findings as Western would have us read them, the guaranty would be in effect omitting any application to or jurisdiction of the Commissioner, until at least the Certificate was validly amended in accordance with the laws of Delaware.

It could hardly be disputed that if Western had attempted to amend its new Delaware Certificate within a year after the 1929 order, without a solid business showing, plus an overwhelming mandate from its stockholders with only fractional opposition, that the Commissioner would be justified in wondering about the good faith of Western's 1929 application (*Sobieski*). However, under the law as stated in *Sobieski,* it would make no difference when Western, assuming it was a pseudo-foreign corporation as it has been found to be, sought to amend its Certificate. It might have been one year later or 28 years later. The clear requirement of *Sobieski* is that the application to eliminate cumulative voting must be addressed to the sound discretion of the Commissioner, and if, in the opinion of the Commissioner, such application is not "fair, just or equitable to all security holders affected," no permit should issue. (§ 25510.)

We conclude that this court was not misled in *Sobieski* by the Commissioner's findings 4 and 5. They are amply supported by the evidence and they are not erroneous, uncertain or evasive.

(4) At the second hearing, Western offered evidence of the administrative record of the Commissioner to fortify its charge of unfair trial. Western argues in addition that the Commissioner's administrative record is a form of *stare decisis,* and that, if it had been followed, Western's applica-

tion for a change to straight voting would have been approved. A file pertaining to the application of Seaboard Finance Company (1954) was, over objection, admitted.

Objection thereto was severally made by counsel for the Commissioner and the opposing group on the grounds of differing factual backgrounds as to business, instate and out of state holdings and activities, differing corporate histories in respect of California, the number of California shareholders, res judicata does not apply to administrative proceedings, the vote in each instance of the shareholders and numerous others. The Commissioner admitted the Seaboard file, saying in pertinent part:

"I am going to accept the file of Seaboard . . . only for the purpose of disclosure that Seaboard did offer an application . . . to a change in cumulative voting, . . . it resulted in . . . issuing a permit to exchange a new series of preferred and common shares for outstanding preferred shares, . . . I personally recall, objections were made by the holders of approximately, . . . less than one percent of the issued shares . . . then outstanding. . . . I think the applicant wants to show, . . . sort of by way of defense, that the Commissioner has discriminated. I don't see any similarity of facts, just on that score alone, . . . we see here in this present pending matter there is about 30% objecting to the amendment. . . . It was infinitesimal . . . in the Seaboard case.''

Western then offered the files of eleven (11) other corporations which had obtained permits to change to straight voting. Objections thereto were sustained. The eleven (11) files were separately marked for identification.

One of the fruits of the mandate trial which resulted in the *Sobieski* appeal was a stipulation between Western and the Commissioner, that the eleven (11) files which had been marked for identification at the second hearing be considered as part of the record of the second hearing and thus made a part of the record before the trial court. A statement concurrently filed on behalf of the Commissioner and made a part of the record explained the eleven (11) files. The statement pointed out that it did not admit the materiality or evidentiary value of the eleven (11) files. It recited it was made ". . . to demonstrate the differing factors pertaining to the application of Western and those of the eleven (11) other companies and for the purpose of showing that the files did not establish . . . a factual background situation similar to Western . . . the files of the eleven (11) cases show there was

no substantial objection by the holders of outstanding shares. None of the eleven (11) cases involved the effort by management to remove minority directors by eliminating the privilege of cumulative voting.''

The eleven cases are listed and the differing pertinent facts cryptically set forth. Thereafter, it recites ''It is clear that these case files represent in some instances entirely different fact situations, applicable to the fairness of the particular stock issue. . . .

''In others, the issuance of a stock dividend by a foreign company having straight voting involved entirely different considerations in passing on overall fairness.

''The twelve (12)[13] files introduced . . . do not support the proposed finding that the Commissioner up to 1956 had an administrative policy to approve straight voting. (F.20.)

''It is true that since the middle 1950's a more definite policy with respect to cumulative voting has developed as reflected in the Commissioner's regulations on the subject, the adoption of which the District Court of Appeal said lay within the Commissioner's jurisdiction.'' The statement further shows other material factual differences. In all cases, the files show, there was no substantial objection by the holders of outstanding shares. In Seaboard, the dissent of shareholders was less than 1 percent. In none of the cases had the corporation involved sought to remove minority directors by eliminating cumulative voting rights. In a number of cases the application requested a permit to issue additional shares in California where the outstanding shares had been issued outside the State of California.

Western replied to the statement of the Commissioner as follows:

''Defendant apparently misapprehends the point raised by plaintiff as to the past administrative interpretations by the Commissioner as evidenced by his acts concerning the 11 companies referred to in defendant's said statement. The point is this: Defendant now claims, and since 1956 has claimed, that straight voting by a foreign corporation having substantial California contacts is per se unfair. The files of the 11 companies in question show, however, case after case where, in one form or another, the Commissioner sanctioned the use of straight voting by such a corporation. . . .

''In these circumstances, proposed Finding 20 is fully justified.''

---

[13]Seaboard was the file originally received. The total of files was 12.

246

Western's reply does not quarrel with any of the facts set forth in the statement of the Commissioner explaining the 11 files.

On the basis of this record, the superior court found:

"19. The Commissioner's action in denying the permit . . . was arbitrary and based upon the Commissioner's personal predilections in favor of cumulative voting. . . .

"20. At the time when said permit was applied for, and . . . the Commissioner had neither rule nor regulation declaring . . . that straight voting . . . , was either unfair, unjust or inequitable or that the same or either of them would be looked upon with disfavor by the Commissioner. By an unbroken series of administrative interpretations extending from 1929 down to 1956, the Commissioner granted permits to foreign corporations having substantial business or other contacts with the State of California. . . . In so doing, the Commissioner was giving full effect to the legislative policy of California, manifested in and since 1929. . . . The Court finds that such interpretations in accordance with the declared legislative policy of California were correct and should have been applied in the instant case.

"21. Since 1956, . . . and for reasons which the Commissioner has not seen fit to explain, he had taken the position that straight voting by foreign corporations having substantial California contacts is unfair *per se*,[14] which is to say in and of itself and without regard to other evidence on the issue of fairness or unfairness. . . . In view of this situation the Court finds that neither in the present case, nor at the present time, nor in the foreseeable future could Western or any other applicant for a permit receive a fair, unbiased trial before the Commissioner on any issue of fairness as between cumulative voting on the one hand and straight voting on the other."

It is patent that Findings 19, 20 and 21 flout the law of the case as enunciated in *Sobieski*, wherein we stated that the California Legislature under the plain language of sections 25009, subdivision (a), 25500 and 25510, intended to confer upon the Commissioner discretionary authority to pass upon the fairness of each of such proposed changes in the voting rights of the outstanding securities of a foreign corporation. (*Sobieski*, pp. 412-414.)

---

[14]The only evidence in the record which we have been able to find and none other has been called to our attention, to support this statement, is the testimony of Assistant Commissioner Smith and the letters of the deputies to which we have called attention. As pointed out, this evidence does no more than reflect a discretion of the Commissioner which we affirmed in *Sobieski*.

The record before us shows that in 1956 prior to Western's application, the Commissioner's policy in respect of straight voting was firm. The very letters written by Assistant Commissioner Smith, heretofore referred to by Western, show that the Commissioner did "look askance" upon straight voting.

The effect of the trial court's findings 19, 20 and 21 is, that either the Commissioner's cumulative voting policy was an abuse of discretion, or that he was estopped from applying it against Western and that the Commissioner, by departing from an alleged prior practice of no policy or policy to the contrary abused his discretion and thus, in effect denied Western a fair trial.

Assuming that there was a prior practice in favor of straight voting, which on the facts is not established, (letters of deputies and testimony of Smith *contra*) and assuming there is similarity in the facts of the 12 cases mentioned to the facts set forth in the application of Western, which is quite an assumption, the effect of the findings mentioned would be that a prior administrative interpretation irrespective of what the courts subsequently say, is conclusive evidence of California's legislative policy, or that there can be no deviation from a fixed administrative policy in respect of which there is discretion conferred by law. We have already said in *Sobieski*, that legislative policy is to the contrary for pseudo-foreign corporations. This is the law of the case. Wholly aside from *Sobieski*, the interpretation contended for by Western would freeze all of the Commissioner's policies and rules in a straight jacket, in spite of changing conditions and/or more solid afterthought. The courts have uniformly held, even assuming a prior administrative policy, that the same administrative agency had the power to adopt a new policy, if it is not contrary to law, and is not per se an abuse of discretion, and that there is no doctrine of estoppel in respect thereof. (Sections 25507, 25510; *Shawmut Assn.* v. *Securities & Exchange Com.* (1st Cir. 1945) 146 F.2d 791.

We also said in *Sobieski*, page 412: "The fact that since the commencement of this action the commissioner has seen fit to enunciate certain administrative rules which will be applied when dealing with a pseudo-foreign corporation does not indicate any abuse of his discretion. Such corporations have existed for many years. and naming them does not change their nature. Contrariwise, it would appear to be a just and fair administrative step to preinform those interested in such corporations as to the standards which will be applied by the

commissioner in considering various applications and granting various permits.''

It should be noted, too, that none of the findings 19, 20, 21 referred to above, although in effect holding that the Commissioner's order was arbitrary and was not based upon ''. . . an impartial consideration of the evidence . . . whether the proposed change was fair, just and equitable as to all the security holders, . . .'' set forth in the form of ultimate fact or otherwise just what affirmative showing Western did make to justify the granting of a permit.

We reiterate that so far as we are able to discern, the only affirmative showing made by Western to persuade the Commissioner that it was entitled to make the change, was that a majority of shareholders voted for it and its argument that the Commissioner's prior administrative policy as indicated by the twelve (12) files introduced, showed that it had been the Commissioner's policy to grant such permits.

The record shows, however, *without dispute,* that on October 10, 1956, at a shareholders' meeting called for that purpose, there were 743,963 shares outstanding and entitled to vote. 442,780 voted for the change. 199,810 voted against it. A vote of 371,982 was required under Delaware law to make the change. Included in the shares counted pro were 194,278 shares (represented by orange proxies) obtained prior to August 31, 1956, the date Western received from the Commissioner a negotiating permit to solicit proxies. The orange proxies were also received prior to the date Western had corrected its literature as required by the Securities and Exchange Commission. The Commissioner, in his Finding XXXII, found these proxies void and in his conclusions, specifically VIII, held: ''. . . the orange proxies . . . secured . . . prior to August 31, 1956, . . . were void; . . . the negotiating permit, . . . did not validate the said proxy; . . . the Commissioner cannot recognize the validity of the aforesaid void orange proxies and consequently must conclude that said amendment is not adopted by a majority vote of the shareholders.

''[E]ven if all the orange proxies had been validly voted and a majority . . . had duly voted in favor of the amendment, the . . . Commissioner concludes that under the circumstances of this case . . . , and the entire manner in which the shareholders' meeting was called and conducted, applicants' action was unjust, unfair and inequitable to the security holders residing in California.''

The trial court found the findings and conclusions of the Commissioner, excerpted above, untrue. It accepted Western's theory that the negotiating permit issued to it by the Commissioner on August 31, 1956, after the Commissioner knew the orange proxies had been solicited, made said proxies valid.

Western's affirmative position as well as its claim to lack of jurisdiction depends completely upon the valid vote of a majority of its shareholders. This would be true, even in Delaware. Assuming, as Western contends, that the negotiating permit issued to August 31, 1956, ratified as legal the orange proxies it had collected prior to the issuance of that permit, which we consider it unnecessary to decide, the only showing before this court is that Western conducted a valid election, a majority of stockholders voted for the change and that there is nothing inherently wrong in straight voting. On this record, that is not enough to disturb the February order.

THE EVIDENCE SUSTAINS THE FINDINGS AND
THE RECORD SUSTAINS THE FEBRUARY ORDER.

*Sobieski* remanded the case for retrial on the single issue of whether there was substantial evidence to support the Commissioner's findings.

We have pointed out that Western has developed this point as a twin issue.

In respect of this twin issue, Western, relying upon *Moran* v. *Board of Medical Examiners,* 32 Cal.2d 301, 308-309 [196 P.2d 20], contends that the superior court is not bound by the Commissioner's findings and can, predicated upon the administrative record, make its own findings contrary to those of the Commissioner. This, the superior court did. Western asserts therefore, that this court is bound by the new findings if they are supported by "credible, competent evidence." (*Yakov* v. *Board of Medical Examiners,* 68 Cal.2d 67 [64 Cal.Rptr. 785, 435 P.2d 553] (Sac. 7810); filed by the Supreme Court 1/11/1968.)

If this proposition is accepted, it is obvious there is no review of what the superior court does on this facet of the litigation, if there is "credible, competent evidence" in the record for the findings made by the superior court to sustain the judgment before us. As pointed out in the *Moran* dissent, this means that the Commissioner's discretion has been thoroughly emasculated, even though the record shows abundant substantial evidence to sustain his findings. The superior court thus, in the final analysis, exercises if there is a conflict in evidence in the administrative record, the authority and discretion vested in the Commissioner by the Legislature.

■ We do not reach this question because it is clearly settled that a finding of fact where made by an administrative or a judicial officer, must have "credible, competent evidence" to support it. We have on our own motion augmented the record by bringing before us the entire record before the Commissioner, which was all there was before the superior court. We have meticulously scrutinized that record and find no "credible, competent evidence" to support the superior court's findings in favor of Western on the twin issue.[15]

In disposing of the trial court's finding on the issue of fair trial we have discussed evidence on that subject, all of which is inextricably interwoven with the findings made by the trial judge on the twin issue raised by Western.

We do not intend to analyze the record to show that there is abundant evidence to support the Commissioner's findings on the twin issue. Accepting the theory Western urges, to wit: *Moran* and *Yakov, supra,* there must be "credible, competent evidence" in favor of Western to support the findings on the twin issue. We find no evidence or proper inference to support the trial court's findings contrary to those made by the Commissioner, except, perhaps, in respect of one wherein the trial court found that it was ". . . Bartman's intention that his group should obtain control of Western and merge it with another airline. . . ."

At the outset, it should be noted that one of the arguments most frequently made in favor of straight voting vis-a-vis cumulative voting is that the Bartman intention is a probability inherent in cumulative voting. There was abundant testimony on that defect of cumulative voting before the Commissioner. However, without discussing the arguments on this subject, we analyze the specific evidence on this finding. The president of Western testified: ". . . Mr. William Bartman said they were going to make a tender and buy control of the company. . . . [A]nd they were going forward and get control of the company. I said, 'Well, this is a free country and anybody can buy stock if they want to. I am sorry to hear this because. . . . I think they should be widely held. . . . I am

---

[15]The record at bench shows that the trial court had no witnesses before it and took no new evidence. (Fn. 2, *supra*.) The record before us is identical in all respects to the record before the trial court. It seems to us therefore, that an appellate court has the same power with respect to the review of such an administrative record which it has in respect of written instruments construed by a trial court when no extrinsic evidence has been introduced. An appellate court would therefore not be bound by a judgment of the trial court. *Moran* and *Yakov, supra,* do not touch this point.

just working for the company . . . and if that is what you have to say, I would like to call back my two associates.' ''

After the date on which William Bartman made the statement, Western filed its application for a permit to which we have referred in some detail. Exhibit K attached to said application, recites, among other things:

''It should be noted here that the management knows of no derogatory information with respect to the standing and character of Messrs. Bartman and Billard in their own communities.''

In these circumstances, we doubt the validity of the finding. And in any event, it is completely immaterial. The right to cumulative voting does not depend upon the motive of a single shareholder who desires to exercise it. The right is granted by law. A desire to merge is not necessarily improper or against the best interests of shareholders. Further, explicit law in respect of the high fiduciary duty a director owes to the corporation and its shareholders is such, that a director who violates this strict fiduciary relationship does so at great peril. There is no suggestion in the record that a fiduciary relationship was going to be violated. It is clear, too, from abundant uncontroverted evidence that Western was in an impregnable position to protect itself against anything suggested by Bartman or Billard, which management, as it was constituted before and after the advent of Bartman and Billard didn't like.

A meticulous examination of the record discloses no evidence on any of the four grounds urged by Western or any other ground to sustain Finding 4.

Western's appeal must, of necessity, depend entirely upon the fact that the shareholders, by a majority of valid votes, directed the change.

As pointed out, the superior court did find a valid election on the theory that the negotiating permit made the orange proxies valid. The Commissioner had held to the contrary. The Commissioner's findings as to how the orange proxies were procured, are supported by substantial and undisputed evidence.

Assuming, however, the Commissioner is wrong, the question before him would have been, if a majority did vote for it, does the Commissioner still have discretion. It seems obvious to us that a showing that the amendment sought by Western is fair, just and equitable, must amount to something more than that a majority of the shareholders are for straight vot-

ing. If only such a showing were required, there would be no necessity to apply to the Commissioner for a permit at all. All that would be necessary would be for a pseudo-foreign corporation to regularly notice and hold an election and then file a Certificate of the results of the election, showing that a majority of the shareholders were for the change, with the Secretary of State.[16]

We are convinced that Western received a fair trial, that the evidence abundantly supports each and every finding of the Commissioner, and the record supports the February order.

The judgment is reversed, and the cause is remanded to the trial court with directions to enter judgment in favor of appellant, denying the petition for a writ and affirming in all respects the Commissioner's order of February 5, 1958.

Herndon, J., and Katz, J. pro tem.,* concurred.

A petition for a rehearing was denied February 21, 1968, and respondent's petition for a hearing by the Supreme Court was denied April 10, 1968. Mosk, J., did not participate therein.

---

[16]Although we believe cumulative voting to be a substantial right, we do not attempt to hold a brief for or against cumulative voting. It was first adopted as part of its Constitution by the State of Illinois in 1870. California followed in 1879. It is current in many other states, all national banks are required to provide for it. Considerable oral testimony was taken and various exhibits were introduced before the Commissioner on the merits. In Commissioner's Exhibit 31, an article by Charles M. Williams in the May-June 1955 issue of the Harvard Business Review, Mr. Williams, after an analytical summary of arguments pro and con objectively states his views.

It is clear from the summary that the subject is eminently proper for the exercise of discretion. Appellant's Exhibit 36 ''A Record of Stockholder's Reaction to Cumulative Voting'' by Charles Harwood, Jr. (1956) and 38 ''The Business Lawyer'' (November 1955) expose the fallacies and weaknesses of cumulative voting.

*Assigned by the Chairman of the Judicial Council.